STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

David James WILSON, Defendant-Appellant-Cross Petitioner.

Supreme Court

*No. 87–0761–CR. Argued January 4, 1989.—Decided May 30, 1989.*

(Also reported in 440 N.W.2d 534.)

For the plaintiff-respondent-petitioner the cause was argued by *Barry Levenson,* assistant attorney general, with whom on the briefs was *Jerome S. Schmidt,* assistant attorney general, and *Donald J. Hanaway,* attorney general.

For the defendant-appellant-cross petitioner there was a brief by *Jed Stone* and *The Law Offices of Jed Stone, Ltd.,* Chicago, Illinois, and oral argument by *Mr. Stone.*

LOUIS J. CECI, J.  This case is before the court on petition and cross-petition for review of a decision of the court of appeals, *State v. Wilson,* 145 Wis. 2d 143, 426 N.W.2d 56 (Ct. App. 1988), which reversed the judgment and order of conviction of the defendant entered by the circuit court for Kenosha county, Jerold W. Breitenbach, Circuit Judge. Four issues are presented for review. The first issue is whether the evidence

produced at trial was sufficient for the jury to find the defendant guilty of second-degree murder under sec. 940.02, Stats. 1967.[1] We conclude that the evidence produced at trial was sufficient for the jury to find the defendant guilty of second-degree murder. The second issue is whether the circuit court erred in failing to instruct the jury on the lesser-included offense of homicide by reckless conduct, sec. 940.06, Stats. 1967.[2] We find that the circuit court did not err in failing to instruct the jury on the lesser-included offense of homicide by reckless conduct. The third issue is whether the sixteen-year delay between the date of the alleged offense and the filing of the criminal complaint violated the defendant's right to due process. We hold that the sixteen-year delay between the date of the offense and the filing of the criminal complaint did not violate the defendant's right to due process. The fourth issue is whether the defendant was denied a fair trial as a result of the publicity generated before and during his trial. We conclude that the defendant was not denied a

---

[1]Section 940.02, Stats. 1967, provided as follows:

**940.02 Second-degree murder.** Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years.

[2]Section 940.06, Stats. 1967, provided as follows:

**940.06 Homicide by reckless conduct. (1)** Whoever causes the death of another human being by reckless conduct may be fined not more than $2,500 or imprisoned not more than 5 years or both.

**(2)** Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin.

fair trial as a result of the publicity generated before and during his trial.

The facts of this case are as follows. On January 8, 1969, Donald John Miller, the four-year-old stepson of the defendant, died at Kenosha Memorial Hospital following emergency surgery the night before to repair a ruptured stomach. Dr. Harold Wagner, coroner of Kenosha county, performed an autopsy and concluded that the cause of death was "shock and peritonitis following rupture of the stomach due to undetermined trauma." Dr. Wagner noted that there was no apparent preexisting pathology to account for the ruptured stomach. Dr. Wagner also found calloused rib fractures. Dr. Wagner observed that Donald fell several times during the previous few weeks and that "[a]ny of these could have caused his fractured ribs and the terminably related lacerated stomach." However, Dr. Wagner then stated that absent "a specific incident of force or trauma and without a lesion on the skin, we cannot relate any of the falls directly to the above findings." In conclusion, Dr. Wagner speculated that the death may have been due to an accidental fall or falls, but the evidence available to him was inconclusive.

On January 8 and 12, 1969, Kenosha County Deputy Sheriff Robert Hubbard interviewed the defendant. The defendant told Hubbard that on the morning of January 7, 1969, Donald complained of a headache and stayed home from school. The defendant remained at home with Donald, while other family members left the house for the day. The defendant stated that he was home alone with Donald from the time defendant's wife left the house in the morning until approximately 4:00 p.m. The defendant stated that he worked outside on a car during the morning but periodically checked on Donald, who stayed in bed until lunchtime. At approxi-

mately 12:00 noon, the defendant prepared Donald a lunch of chicken noodle soup without the noodles. The defendant further stated that the only physical complaint Donald made during that time was that he was cold. The defendant did not account for Donald's fatal injuries, but did state that in the past Donald seemed uncoordinated and once had burned his fingers while reaching under a space heater for a toy.

In addition to interviewing the defendant in January, 1969, deputies from the Kenosha county sheriff's department also interviewed Donald's mother, four sisters, neighbors, and teachers. They also reviewed the medical records. However, without solid evidence of criminal conduct, the investigation was terminated by the Kenosha county sheriff's department in 1969. The investigation was briefly reopened in March, 1973, when the defendant's stepdaughters, after the defendant's arrest for sexual intercourse with a minor, told authorities that the defendant had physically abused Donald. Dr. Wagner was reinterviewed and again said that he could not link any known conduct to Donald's fatal injuries. Therefore, the investigation was once again closed without charges being sought or filed.

The case remained dormant until early 1985 when David Cole, news director of radio station WLIP in Kenosha, gave a 35-page report concerning Donald's death to the district attorney. Mr. Cole, as part of his lengthy investigation, consulted with Dr. Robert W. Huntington III, a forensic pathologist and associate professor of medicine at the University of Wisconsin Medical School, who said that he was at least 95 percent certain that Donald died as a result of child abuse. Dr. Huntington recommended reopening the formal investigation. A special prosecutor was appointed in June, 1985, and the investigation was reopened.

On August 23, 1985, at the conclusion of a John Doe hearing, a criminal complaint was issued charging the defendant with second-degree murder, contrary to sec. 940.02, Stats. 1967, in connection with the death on January 8, 1969, of Donald John Miller. A jury trial on that charge commenced on January 20, 1986. During the trial, Dr. Morris Siegel, Donald's physician, testified that in the late afternoon of January 7, 1969, Donald's mother brought Donald to his office in a "moribund" state with a distended abdomen and that he immediately took the boy to the hospital, as he appeared to be near death. X-rays indicated the possibility of a ruptured internal organ and peritonitis. X-rays also showed five old rib fractures previously unknown to Dr. Siegel. Dr. Siegel concluded that Donald had a ruptured internal organ and peritonitis and assisted in emergency surgery which was performed late that evening. Donald's abdominal area was opened, revealing a three-centimeter stomach tear and the presence of some 1200 cubic centimeters of yellow, murky fluid containing food particles. Donald died the next morning.

Dr. Siegel testified that the stomach laceration would have had to come from a blunt abdominal blow, such as a punch or kick, probably after Donald had consumed the soup, because under ordinary circumstances a blow to the abdomen would not cause a ruptured stomach if the stomach was not distended, and an empty stomach will not rupture, as there is not enough tension. Therefore, Dr. Siegel concluded that the underlying trauma had to have happened sometime in the afternoon of January 7, 1969, hours before he saw Donald. Dr. Siegel testified that due to the unexplained ruptured stomach and the five calloused rib fractures, he asked Dr. Wagner to perform an autopsy.

Dr. Siegel noted that Donald was admitted to the hospital on two previous occasions, once as an infant for treatment of iron-deficiency anemia and subsequently for a tonsillectomy. Dr. Siegel also stated that Donald was seen in the emergency room on a few occasions for cuts and scrapes. He also noted that, on December 21, 1968, Donald was treated for an injury described by his mother as bruised testicles which resulted from falling on a chair at school. Dr. Siegel testified that Donald was generally healthy and that his mother brought the boy either to the hospital or his office when Donald needed medical attention.

Dr. Huntington testified that he reviewed the autopsy report of Dr. Wagner along with the surgery and police reports and concluded to a reasonable degree of medical certainty that Donald died as a result of child abuse. Dr. Huntington noted the presence of five healing rib fractures for which no explanation was offered, burns on the fingers, and the acute, unexplained stomach rupture. He testified that the stomach ruptured from a concentrated application of energy to the abdominal area which was unlikely to have resulted from an accident because a stomach tear such as that suffered by Donald results from a concentrated high-energy blow to the abdomen, such as that from a punch or a kick. Accidental causes, such as a fall, were ruled out by Dr. Huntington, as the force required to cause the type of stomach tear suffered by Donald would be akin to a fall from a second-story window onto an object that would concentrate the force or akin to an injury suffered in a motor vehicle accident, neither of which was supported by the evidence available.

Dr. Huntington testified that the result of a stomach tear is that the stomach contents escape into the peritoneal cavity, causing peritonitis which, if not

arrested within hours, is fatal. Dr. Huntington further testified that consumption of a large quantity of liquid prior to the application of blunt-force energy to the abdominal area makes the stomach more susceptible to rupture and, in this case, the underlying trauma leading to Donald's death happened after Donald had consumed the soup at lunch.

The state's other forensic pathology witness, Dr. Mary E. S. Case, testified, consistent with Dr. Siegel and Dr. Huntington, that an ordinary fall would not result in a torn stomach, but that such injury occurs more frequently from vehicular accidents or from significant falls, such as from a second- or third-story window or from a tree onto a picket fence. Dr. Case testified that the type of blow which would have caused Donald's lacerated stomach is consistent with a punch or kick to the abdominal area.

Dr. Case further testified, as did Dr. Huntington, that Donald's death was not accidental and was consistent with the battered-child syndrome, based on unexplained or insufficiently explained injuries such as abrasions, burns, healing fractures of five ribs, bruised testicles, and the acute rupture of Donald's stomach. Finally, Dr. Case testified that there is nothing in a typical home reasonably capable of producing a fatal stomach laceration by accidental means.

Susan Antrim, Donald's sister, testified to instances where the defendant physically abused her brother at their apartment. One such incident, on January 6, 1969, involved the defendant scuffling with Donald behind closed doors in the bathroom and then forcing Donald to drink steaming water. Mrs. Antrim testified that the defendant then kicked her brother in the upper torso after he vomited a clear liquid. Mrs. Antrim stated that Donald was frequently physically

abused by the defendant, after which the defendant would order Donald to smile instead of cry. She stated that she did not tell her mother about these events because the defendant told her "that if we ever told our mother what was going on, we would get the same thing that Donnie was getting."

Another sister, Joan Flatley, testified that shortly before Donald died, she, Donald, and the defendant were in the bathroom where she was brushing her teeth, and at that time she saw the defendant slam the toilet seat on Donald's testicles. Mrs. Flatley and Mrs. Antrim both stated that they were questioned by police shortly after Donald's death, but before the police officers arrived the defendant warned them against volunteering information. Mrs. Flatley recalled the defendant's warning that she would be "sleeping with [Donald]" if she gave information to the police. No evidence introduced indicated that the victim was abused by any person other than the defendant.

Nancy Gustke, Donald's Head Start teacher, testified that shortly before Donald's death, she saw marks on his body, notified the principal, and was going to make a home visit concerning these observations, but that plan was aborted because of Donald's death. Ms. Gustke also said that Donald was a normal, healthy child who had not been injured at school while a pupil of hers.

Two former neighbors and babysitters, Mary Ann Wade and Marie Kartsonas Hughes, both testified that Donald was a healthy, normal child prior to his death. Mrs. Hughes, however, said that Donald became withdrawn and frightened after the defendant moved into the household.

The defendant's own testimony did not shed any light on the reason for Donald's fatal injuries. The

defendant testified that he liked Donald and denied killing him. The defendant admitted that Donald was alone with him at home during the day on January 7, 1969, but could not recall any injuries that Donald may have suffered that day and had no explanation for the cause of Donald's ruptured stomach.

The defense pathologist, Dr. Chesley Erwin, testified that he could not make, to a reasonable degree of medical certainty, the same findings that Dr. Huntington and Dr. Case had made with respect to Donald's death, but conceded that Donald's injuries were more apt to occur after ingestion of liquid and as a result of "appreciable energy" to a filled stomach area, consistent with a punch or kick. However, Dr. Erwin said that Donald's fatal injuries also could have resulted from an accidental fall in the home.

At the conclusion of evidence, the circuit court reviewed the jury instructions with the attorneys and ruled that no instruction would be given on the offense of reckless homicide because the statute of limitations had run on that offense.[3] On January 28, 1986, the jury

---

[3]Section 939.74, Stats. 1967, provided in relevant part as follows:

> **939.74 Time limitations on prosecutions. (1)** Except as provided in sub. (2), prosecution for a felony must be commenced within 6 years and prosecution for a misdemeanor or for adultery within 3 years after the commission thereof. Within the meaning of this section, a prosecution has commenced when a warrant or summons is issued, an indictment is found, or an information is filed.
>
> **(2)** Notwithstanding that the time limitation under sub. (1) has expired:
>
> (a) A prosecution for murder may be commenced at any time;
>
> . . .

In *State v. Muentner,* 138 Wis. 2d 374, 406 N.W.2d 415 (1987), this court held, in a decision from which I dissented, that once a trial

found the defendant guilty of second-degree murder. On February 25, 1986, the trial court denied all the defendant's preverdict and postverdict motions. Thereafter, the circuit court sentenced the defendant to an indeterminate prison term not to exceed twenty years.

The defendant subsequently moved for postconviction relief, seeking a new trial or, in the alternative, a reduction of his sentence. On April 10, 1987, the postconviction motions were denied by the circuit court. On April 29, 1987, the defendant filed his notice of appeal.

The defendant raised four issues before the court of appeals which are relevant to our review. First, the defendant argued that the evidence produced at trial was insufficient for the jury to find him guilty of second-degree murder. The court of appeals held that the evidence produced at trial was sufficient for the jury to find the defendant guilty of second-degree murder. Second, the defendant argued that the circuit court erred in refusing to instruct the jury on the lesser-included offense of homicide by reckless conduct. The court of appeals found in regard to this issue that, in viewing the evidence most favorably to the defendant, the submission of the lesser-included offense of homicide by reckless conduct was required because of the void in the evidence concerning the defendant's specific conduct. Consequently, the court of appeals reversed the judgment and order of the circuit court and

judge concludes that the evidence warrants the giving of a lesser-included offense instruction, it is error to refuse to submit the lesser-included offense instruction because the statute of limitations has run on the lesser-included offense. Consequently, the reason articulated by the circuit court for refusing to give the instruction on the lesser-included offense was incorrect as a matter of law.

remanded the case for a new trial on this issue. Third, the defendant argued that due process required a dismissal of the prosecution because of the prejudice suffered as the result of the sixteen-year delay between Donald's death and the defendant's prosecution. The court of appeals held, citing *State v. Rivest,* 106 Wis. 2d 406, 418, 316 N.W.2d 395 (1982), that when a defendant seeks to avoid prosecution based on prosecutorial delay, it must be shown that the defendant has suffered actual prejudice arising from the delay and that the delay arose from an improper motive or purpose. The court then found that the defendant had failed to meet his burden of proving that the state's delay in charging arose from an improper motive or purpose. Therefore, the court found no violation of the defendant's due process rights. Finally, the defendant argued that he was denied a fair trial as the result of the publicity generated before and during his trial. The court of appeals did not address this issue, due to its decision to order a new trial.

## WHETHER THE EVIDENCE PRODUCED AT TRIAL WAS SUFFICIENT FOR THE JURY TO FIND THE DEFENDANT GUILTY OF SECOND-DEGREE MURDER UNDER SEC. 940.02, STATS. 1967

When a criminal defendant argues on appeal that the evidence was insufficient to convict him, this court does not retry the case on the facts in the record to determine if each member of this court is convinced of the defendant's guilt beyond a reasonable doubt. *Fox v. State,* 60 Wis. 2d 462, 470, 210 N.W.2d 722 (1973). Rather, this court must affirm the conviction if it finds

that the jury, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Alles,* 106 Wis. 2d 368, 376, 316 N.W.2d 378 (1982).

The function of weighing the credibility of witnesses is exclusively in the jury's province, and the jury verdict will be overturned only if, viewing the evidence most favorably to the state and the conviction, it is inherently or patently incredible or so lacking in probative value that no jury could have found guilt beyond a reasonable doubt. *Id.* at 376–77, quoting *Fells v. State,* 65 Wis. 2d 525, 529, 223 N.W.2d 507 (1974). If more than one inference can be drawn from the evidence, the inference which supports the jury finding must be followed unless the testimony was incredible as a matter of law. *Alles,* 106 Wis. 2d at 377, quoting *Murphy v. State,* 75 Wis. 2d 522, 526, 249 N.W.2d 779 (1977). Thus, if any possibility exists that the jury could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we will not overturn a verdict even if we believe that a jury should not have found guilt based on the evidence before it. *Alles,* 106 Wis. 2d at 377. The preceding principles, which limit our review, are grounded on the sound reasoning that the jury has the great advantage of being present at the trial; the jury can weigh and sift conflicting testimony and give weight to those nonverbal attributes of the witnesses which are often persuasive indicia of guilt or innocence. *Id.*

In order to be convicted of second-degree murder, the evidence must show that the accused's conduct was (1) imminently dangerous to another; (2) of such a character that it evinced a depraved mind, regardless of life; and (3) the cause of the victim's death. Sec. 940.02, Stats. 1967; *State v. Johnson,* 135 Wis. 2d 453, 455, 400

N.W.2d 502 (Ct. App. 1986); *State v. Bernal,* 111 Wis. 2d 280, 283, 330 N.W.2d 219 (Ct. App. 1983).

A conviction for second-degree murder may be based in whole or in part upon circumstantial evidence. *State v. Koller,* 87 Wis. 2d 253, 266, 274 N.W.2d 651 (1979); *Johnson,* 135 Wis. 2d at 456. The qualities of conduct necessary to prove criminal conduct in a second-degree murder case are found in the act itself and the circumstances of its commission. *State v. Hooper,* 101 Wis. 2d 517, 542, 305 N.W.2d 110 (1981); *State v. Olson,* 75 Wis. 2d 575, 582, 250 N.W.2d 12 (1977). The type, nature, extent, and degree of force required to produce the injuries which resulted from the conduct provide the type of circumstantial evidence upon which a second-degree murder conviction can be based. *Hooper,* 101 Wis. 2d at 542–43.

The defendant argues, citing *Seidler v. State,* 64 Wis. 2d 456, 219 N.W.2d 320 (1974), that there is insufficient evidence to prove both the conduct and the mental state necessary to establish second-degree murder. We disagree with the defendant's conclusion and believe that *Seidler* is readily distinguishable on its facts.

In *Seidler,* a 22–year-old male babysitter was originally convicted of second-degree murder for causing the death of a 2–year-old child. *Id.* at 457. The evidence produced at trial was consistent with the defendant's version of his conduct. The defendant testified that he had angrily grabbed the child by the arm and threw her into a bedroom in the direction of a bed where she hit her stomach against a portion of the bed. *Id.* at 463. There was no evidence that the defendant threw the child at the hard and unyielding

portions of the bed. *Id.* In addition, there was no evidence of any prior abuse by the defendant. *Id.* at 458.

This court held that the defendant's conduct, though done in a reckless and callous manner, was not consciously such conduct that it is imminently dangerous to life so as to serve as the basis for a conviction for second-degree murder. *Id.* at 464. In addition, the court found that although the defendant's conduct created a situation of unreasonable risk of harm or of death to the 2–year-old child, the defendant's conduct did not evince a depraved mind regardless of human life. *Id.* at 465. Therefore, this court reversed the defendant's conviction for second-degree murder and ordered a new trial on the charge of homicide by reckless conduct. *Id.* at 466.

In the present case, the defendant had no explanation for the cause of Donald's ruptured stomach. The expert medical testimony presented by the state at trial revealed, however, that the trauma required to cause an injury of the nature sustained by Donald would have had to come from a violent application of blunt force to the abdomen and not from a routine fall. Moreover, the state produced evidence that there is nothing in a typical home reasonably capable of producing a fatal stomach laceration by accidental means.

The state's evidence also demonstrated that the trauma causing Donald's stomach to tear had to have been caused during the time when the defendant, by his own admission, was home alone with Donald. Furthermore, evidence produced at trial indicated an extensive history of abuse of Donald by the defendant. Finally, two of Donald's sisters testified that before they were questioned by the police shortly after Donald's death, the defendant had warned them against volunteering information. More specifically, one of Donald's sisters

testified that the defendant warned her that she would be "sleeping with [Donald]" if she gave information to the police.

We must determine whether such evidence, believed and rationally considered by the jury, is sufficient to circumstantially establish the elements of second-degree murder. The test for circumstantial evidence is whether it is strong enough to exclude every reasonable hypothesis of innocence. *Johnson,* 135 Wis. 2d at 456. This is a question of probability, not possibility. *Id.* at 457. After considering the evidence as a whole, and especially the medical testimony and the evidence of child abuse, we conclude that the jury could eliminate accident or misadventure as a reasonable hypothesis of innocence. *Id.* at 465. The expert testimony concerning the level of force needed to cause the injury, coupled with the surrounding circumstances, arguably places such a theory beyond the realm of possibility. *Id.*

As to other circumstances of death short of second-degree murder, we are satisfied that the jury could have drawn the appropriate inferences from the evidence adduced at trial concerning the nature of the injury and the pattern of abuse to conclude that these do not fall within the realm of probability as required by the law of circumstantial evidence. *Id.* After weighing all the evidence, we conclude that the jury could properly find that there was no other reasonable conclusion but that the defendant was the instrument of Donald Miller's death under circumstances constituting second-degree murder. Consequently, we affirm the court of appeals' holding that the evidence produced at trial was suffi-

cient for the jury to find the defendant guilty of second-degree murder under sec. 940.02, Stats. 1967.

## WHETHER THE CIRCUIT COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF HOMICIDE BY RECKLESS CONDUCT, SEC. 940.06, STATS. 1967

■■■

While the circuit court is given broad discretion with respect to the submission of jury instructions, when the issue is whether the evidence adduced at trial permits the giving of a lesser-included offense instruction, a question of law is presented. *State v. Michels,* 141 Wis. 2d 81, 95, 414 N.W.2d 311 (Ct. App. 1987). This court decides questions of law independently, without deference to the trial court or the court of appeals. *Contempt in State v. Dewerth,* 139 Wis. 2d 544, 552, 407 N.W.2d 862 (1987).

■■■

A circuit court has the duty to accurately give to the jury the law of whatever degree of felonious homicide the evidence tends to prove and no other. *State v. Stortecky,* 273 Wis. 362, 369, 77 N.W.2d 721 (1956). It is error for a court to refuse to instruct on an issue which is raised by the evidence or to give an instruction on an issue which finds no support in the evidence. *Lutz v. Shelby Mutual Ins. Co.,* 70 Wis. 2d 743, 750, 235 N.W.2d 426 (1975). The submission of a lesser-included offense instruction is proper *only* when there are reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense. *Hawthorne v. State,* 99 Wis. 2d 673, 682, 299 N.W.2d 866 (1981).

To give an instruction on a lesser included offense when the commission of that lesser included offense is not reasonably shown by the evidence is no favor to a defendant. The inclusion of a doubtful lesser included offense is likely to result in a jury's compromise to the detriment of the defendant. Numerous cases arise in which the proper alternative for the jury is either the conviction on the major crime or a complete acquittal. To superfluously add to the verdict a lesser included offense may well in some cases result in the defendant being found guilty of that offense when a verdict of not guilty should have been returned.

*Ross v. State,* 61 Wis. 2d 160, 170, 211 N.W.2d 827 (1973).

The differentiating factors between second-degree murder and reckless homicide are the actor's conduct and state of mind. As to conduct, second-degree murder contemplates an act imminently dangerous to another whereas reckless homicide contemplates an act creating a situation of unreasonable risk and high probability of death or great bodily harm. *See* secs. 940.02 and 940.06(2), Stats. 1967. As to state of mind, second-degree murder contemplates a depraved mind whereas reckless homicide contemplates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. *Id.*

A special situation arises, as in this case, where the defendant presents wholly exculpatory testimony as to the charged offense but requests a lesser-included offense instruction which is directly contrary to the defendant's version of the facts. In such a situation, we have concluded that in viewing the evidence in the most favorable light it will reasonably admit from the

standpoint of the accused, we must take into account the fact that the jury could reasonably disbelieve the defendant's version of the facts. *State v. Sarabia,* 118 Wis. 2d 655, 663, 348 N.W.2d 527 (1984). Consequently, we have held that a defendant or the state may request and receive a lesser-included offense instruction, even when the defendant has given exculpatory testimony, if a reasonable but different view of the record, the evidence, and any testimony other than part of the defendant's testimony which is exculpatory supports acquittal on the greater charge and conviction on the lesser charge. *Id.*

We note, however, that:

> It is unreasonable to find a basis for a lesser-included offense by assuming that the jury may repudiate the other evidence if none of it supports the lesser offense. It is unreasonable because jurors are assumed to be reasonable in their deliberations. If, of course, the testimony of the other witnesses conflicts, and part of the testimony supports the lesser offense, that offense must be submitted to the jury. Similarly, if part of the testimony of other witnesses reasonably supports an inference providing a basis for the lesser offense, that offense must be submitted to the jury. But if none of the other evidence or reasonable inferences from it support the lesser offense, it cannot be said that under a different but 'reasonable view' the evidence is sufficient to establish guilt of the lower degree ....

*State v. Simpson,* 125 Wis. 2d 375, 382, 373 N.W.2d 673 (Ct. App. 1985).

Therefore, in determining whether the defendant is entitled to an instruction on the lesser-included offense of homicide by reckless conduct, we must reject the defendant's wholly exculpatory evidence that he did

900

nothing to harm the child on the day in question. *Sarabia,* 118 Wis. 2d at 663–64; *Simpson,* 125 Wis. 2d at 380. In addition, we must review the remaining evidence, the defendant's nonexculpatory testimony, and other witnesses' testimony to determine whether under a different but reasonable view of the record the remaining evidence supports acquittal on the greater charge and conviction on the lesser charge.

The defendant argues, citing *Seidler,* that the jury should have been instructed on the charge of homicide by reckless conduct because under the evidence in this case, the jury could have found that the defendant engaged in exactly the same sort of conduct as the defendant did in *Seidler.* The defendant maintains that "[p]erhaps he threw Donnie toward a bed where Donnie landed, without any plan by [the defendant], on some protruding object, or perhaps he pulled Donnie from a top bunk upon finding him poised to follow his sisters' habit of jumping from one top bunk to the other, only to have him land upon some sharp toy on the floor."

The problem with the defendant's argument is that in *Seidler* there was evidence in the record which supported the conclusion that the defendant engaged in conduct constituting homicide by reckless conduct. The defendant in *Seidler* testified that he had angrily grabbed the child by the arm and threw her into a bedroom in the direction of a bed where she hit her stomach against a portion of the bed. *Seidler,* 64 Wis. 2d at 463. In the case presently before us, however, there is not sufficient evidence in the record which would reasonably support a finding of such conduct on the part of the defendant.

Contrary to the court of appeals' holding, the mere fact that the injury suffered by a victim may be

consistent with conduct constituting the crime charged and consistent with conduct constituting the lesser-included offense does not entitle a defendant to an instruction on the lesser-included offense. There must be enough evidence in the record to support *a conviction* on the lesser-included charge before a defendant is entitled to an instruction on the lesser-included offense. *Hawthorne,* 99 Wis. 2d at 682.

Thus, we will review the evidence which supports a conviction on the lesser-included offense of homicide by reckless conduct. In addition to the fact that the injury suffered by Donald was consistent with conduct constituting the crime charged and consistent with conduct constituting the lesser-included offense, the evidence also demonstrates that the defendant was home alone with Donald and had exclusive control over Donald at the time of the injury. Furthermore, in reviewing the remaining evidence most favorably to the defendant, we find that the jury could have rejected the testimony relating to the defendant's prior abuse of Donald and the state's expert medical testimony which indicated that there is nothing in a typical home capable of producing a fatal stomach laceration by accidental means.

After reviewing this evidence, we conclude that the evidence and the reasonable inferences therefrom are insufficient to support a conviction of the defendant on the lesser-included offense of homicide by reckless conduct. There is simply not enough evidence in the record which would support, directly or circumstantially, the conclusion that the defendant acted in a manner creating a high degree of unreasonable risk of great bodily harm evincing a conscious disregard for the safety of another and a willingness to take known chances of

perpetrating an injury on the day in question. *Compare Seidler,* 64 Wis. 2d at 463. Consequently, we reverse that part of the decision of the court of appeals which found that the circuit court had erred in failing to instruct the jury on the lesser-included offense of reckless homicide.

## WHETHER THE SIXTEEN-YEAR DELAY BETWEEN THE DATE OF THE ALLEGED OFFENSE AND THE FILING OF THE COMPLAINT VIOLATES THE DEFENDANT'S RIGHT TO DUE PROCESS

The defendant argues that his second-degree murder charge should have been dismissed because he was unfairly prejudiced and thus denied due process by the sixteen-year delay in the commencement of criminal proceedings. The defendant claims prejudice from the delay because of (1) the death of two potential witnesses, (2) the unavailability of certain medical records, and (3) the general dulling of memories over a sixteen-year period.

The statute of limitations is the principal device, created by the people of a state through their legislature, to protect against prejudice arising from a lapse of time between the date of an alleged offense and an arrest. *United States v. Lovasco,* 431 U.S. 783, 788–89 (1977); *United States v. Marion,* 404 U.S. 307, 322 (1971). The statute of limitations is not, however, the sole standard by which delay between the date of an alleged offense and an arrest is measured when considering a denial of due process. *State v. Rogers,* 70 Wis. 2d 160, 164, 233 N.W.2d 481 (1975).

[A]pplicable statutes of limitations protect against the prosecution's bringing stale criminal charges against any defendant, ... and, beyond that protection, the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.

*United States v. Gouveia,* 467 U.S. 180, 192 (1984), citing *Lovasco,* 431 U.S. at 789–90; *Marion,* 404 U.S. at 324. *See also United States v. Rein,* 848 F.2d 777, 781 (7th Cir. 1988); *United States v. Hoo,* 825 F.2d 667, 671 (2d Cir. 1987); *United States v. Marler,* 756 F.2d 206, 213 (1st Cir. 1985); *Stoner v. Graddick,* 751 F.2d 1535, 1543 (11th Cir. 1985); *United States v. Sebetich,* 776 F.2d 412, 430 (3d Cir. 1985); *United States v. Comosona,* 614 F.2d 695, 696–97 (10th Cir. 1980). *But see United States v. Townley,* 665 F.2d 579, 582 (5th Cir. 1982); *United States v. Saunders,* 641 F.2d 659, 665 (9th Cir. 1981).[4]

Where a defendant seeks to avoid prosecution based upon prosecutorial delay, it is clear that it must be

---

[4]The dissenting opinion places great reliance on the due process test articulated by the seventh circuit in *United States v. King,* 593 F.2d 269, 272 (1979), a test which has been arguably overruled *sub silentio.* The seventh circuit in its latest opinion on the subject has held that:

A pre-indictment delay will not violate due process unless the defendant is able to prove that the delay caused actual and substantial prejudice to his or her fair trial rights and that the government delayed indictment for tactical advantage or some other impermissible reason. *United States v. Chappell,* 854 F.2d 190, 195 (7th Cir. 1988). *See also United States v. Rein,* 848 F.2d at 781; *United States v. Fuesting,* 845 F.2d 664, 669 (7th Cir. 1988).

shown that the defendant has suffered actual prejudice arising from the delay and that the delay arose from an improper motive or purpose such as to gain a tactical advantage over the accused.

*Rivest,* 106 Wis. 2d at 418. *See also State v. Davis,* 95 Wis. 2d 55, 58, 288 N.W.2d 870 (Ct. App. 1980).

In the case before this court, there is no applicable statute of limitations. Section 939.74(2)(a), Stats. 1967. Therefore, we must focus on the issue of whether the defendant has suffered actual prejudice resulting from the delay and the issue of whether the delay arose from an improper motive or purpose such as to gain a tactical advantage over the accused. Assuming without deciding that the defendant was actually prejudiced by the sixteen-year delay, we find that the defendant has not met his burden of proving that the state's delay in charging arose from an improper motive or purpose. The state asserts that the delay in charging the defendant resulted from the insufficiency of the evidence when the case was investigated in 1969 and 1973. The state maintains that prosecution was commenced in 1985 because new medical interpretation of the evidence concerning potential child abuse made a successful prosecution possible.

The defendant has shown nothing to cause us to doubt the state's assertion. As the court of appeals noted:

At a hearing to determine if the delay violated due process, defense counsel made no showing that the state deliberately withheld the charge to disadvantage the defendant, to harass him or to punish him in any way. *See [State v. Davis,* 95 Wis. 2d 55, 62, 288 N.W.2d 870 (Ct. App. 1980)]. Indeed, in arguing

his position, defense counsel stated that 'if the court is looking for purposeful delay, specifically someone had an ill motive ..., then probably we fail. ... Now, did the people involved purposefully delay? Yes. Why did they delay? We don't know. I can't tell you why.' A defendant's bare allegations of improper tactical purpose on the state's part are insufficient to show malevolent purpose. *Id.* On appeal, [the defendant] has added nothing to his argument but additional 'presumptions' and further allegations.

*Wilson,* 145 Wis. 2d at 158. Consequently, we hold that the defendant has failed to meet his burden of demonstrating that the sixteen-year delay between the date of the alleged offense and the filing of the complaint violated his right to due process.

## WHETHER THE DEFENDANT WAS DENIED A FAIR TRIAL AS THE RESULT OF PUBLICITY GENERATED BEFORE AND DURING HIS TRIAL

The defendant argues that he was denied a fair trial by the combined effect of pretrial publicity, the fact that the trial was televised, and the circuit court's refusal to sequester the jury. The defendant notes that the prosecution itself was promoted by a radio news director's request that the investigation of Donald Miller's death be reopened and, presumably, because of this fact and the age of the case, the local press followed every step of the case, with the major newspapers of Milwaukee and Chicago also covering the trial. In addition, over the defendant's objection, the entire trial was televised by a cable television station. Beyond the general prejudicial impact of this media coverage, the defendant maintains that he suffered a very specific intrusion upon his right to counsel as the result of the

television coverage. The defendant contends that a microphone was located on the defense table which broadcast his conversations with his counsel. During the trial, defense counsel asked the court to order the removal of the microphone from the table; however, the court refused to so order and suggested that defense counsel switch the microphone off when not making public statements.

The sixth amendment of the United States Constitution guarantees the right to a public trial. This constitutional right, however, is not one exclusively held by the defendant. Public access to courts in Wisconsin is provided for in Wis. Const. art. I, sec. 7, and is further guaranteed by sec. 757.14, Stats. Broadcasting court proceedings is an extension of admitting the public into the courtroom and has been permitted in Wisconsin by supreme court rule since 1979, after a fifteen-month experimental period. SCR 61.01, *et. seq.*

A defendant's allegation that publicity prevented him or her from receiving a fair trial must be supported by evidence. *Garcia v. State,* 73 Wis. 2d 174, 190, 242 N.W.2d 919 (1976). In weighing the possibility of prejudice, recognized factors are the inflammatory nature of the publicity, the extent to which it permeated the community and the jury panel, its timing, and the verdict returned. *Id.* at 189.

We conclude, after reviewing the record and the defendant's contentions, that he has failed to demonstrate that the extensive publicity surrounding this case prevented him from receiving a fair trial. The circuit court invoked numerous measures to shield the effects of publicity in order to ensure the defendant a

fair trial. Extensive jury voir dire was permitted, including individual questioning and interrogation on prior knowledge of the case. The circuit court stated that it would bring in jurors from another county if it could not find a panel locally, in lieu of a change of place of trial. The latter measure was not necessary, however, because most prospective jurors had little or no previous knowledge of the case. In fact, a jury was impaneled in less than one-half day. During the trial, the jury was cautioned several times not to read, listen to, or view accounts of the proceedings. At the end of the trial, the jurors were questioned by the circuit court as to whether they had been subjected to media accounts or influences concerning the trial. All the jurors stated that they had not.

In regard to the defendant's claim that the jury should have been sequestered, we note that the circuit court, pursuant to sec. 972.12(1), Stats., has discretion in the matter of sequestration at trial, and we hold, on the basis of the record before us, that the circuit court did not abuse its discretion in refusing to sequester the jury. Finally, in regard to the microphone which was placed at the defense table, we hold that in the event of objection by a party to placement of such a microphone, the circuit court is better advised to order the removal of the microphone. However, because we cannot find any specific instances in the record where the microphone actually interfered with the defendant's right to counsel, we hold that the circuit court's refusal to remove the microphone was harmless error.

In conclusion, we hold that the evidence produced at trial was sufficient for the jury to find the defendant guilty of second-degree murder under sec. 940.02, Stats. 1967. In addition, we find that the circuit court did not err in failing to instruct the jury on the lesser-included

offense of homicide by reckless conduct, sec. 940.06, Stats. 1967. We also find that the sixteen-year delay between the date of the offense and the filing of the criminal complaint did not violate the defendant's right to due process. Finally, we hold that the defendant was not denied a fair trial as a result of the publicity generated before and during his trial.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court with directions to reinstate the judgment of conviction.

HEFFERNAN, CHIEF JUSTICE (dissenting). I take issue with the majority on a single, but nevertheless controlling, point of law. The majority states that the defendant may prevail if the sixteen-year delay in commencing prosecution has violated his right to due process. The majority, however, relies on an improper assignment of the burden of proof in the test of that right. The test of whether prosecutorial delay violates due process was discussed in the Seventh Circuit in *United States v. King,* 593 F.2d 269, 272 (1979):

> Two of the questions left unanswered [by *Marion* and *Lovasco*] are (1) given actual prejudice resulting from the delay, what sort of purpose or reason behind the delay must be shown to give rise to a due process violation, and (2) who bears the burden of proof on the issue. Some courts have seemed to require the defendant to prove that issuance of the indictment was purposefully delayed in an attempt by the Government to gain a tactical advantage over the defendant. ... Others have read *Lovasco* as only requiring the defendant to prove actual prejudice, after which showing it is up to the court to balance the reasons asserted by the Government against the

prejudice asserted by the defendant. ... We believe that the latter view is the better one and most closely follows the balancing analysis employed by the Supreme Court in *Lovasco.*

In order for the court to weigh the competing interests correctly, it is necessary for it to be fully apprised of the reasons asserted by the Government as necessitating the pre-indictment delay. These reasons can best be put forward by the Government. Accordingly, once the defendant has proven (1) actual prejudice (2) resulting from the delay, the burden shifts to the Government to show why the delay was necessary. (Citations omitted.)

The approach of the *King* opinion has been followed, not only in the seventh circuit,[1] but also in the fourth, fifth, and ninth federal circuits. *United States v. Automated Medical Laboratories, Inc.,* 770 F.2d 399, 403–404 (4th Cir. 1985); *United States v. Townley,* 665 F.2d 579, 581–582 (5th Cir. 1982); *United States v. Saunders,* 641 F.2d 659, 665 (9th Cir. 1981); *United States v. Wallace,* 848 F.2d 1464, 1470 (9th Cir. 1988).

Other federal circuits, like the majority in this case, assign to the defendant the burden to prove that the government acted with an impermissible motive. *United States v. Marler,* 756 F.2d 206, 213–215 (1st Cir. 1985); *United States v. Hoo,* 825 F.2d 667, 671 (2d Cir. 1987); *United States v. Sebetich,* 776 F.2d 412, 430 (3d Cir. 1985); *United States v. Padilla,* 819 F.2d 952 (10th Cir. 1987); *United States v. Benson,* 846 F.2d 1338, 1340–1343 (11th Cir. 1988) (but see n. 5). These cases, with the exception of *Hoo,* are devoid of any reasoning

---

[1]The *King* opinion is followed in the seventh circuit by *United States v. Solomon,* 688 F.2d 1171, 1179 (1982). But compare also in the seventh circuit: *United States v. Sweeney,* 688 F.2d 1131, 1137 (1982), *United States v. Rein,* 848 F.2d 777, 781 (1988).

to support their assignment of this burden. Moreover, these cases deal with delays on the order of ten or twenty months, in contrast with the sixteen year delay the defendant in this case has suffered. Finally, these cases uniformly consider defendants' claims to relief that are in addition to their protection under the applicable statutes of limitation. Although most of these cases, like the majority opinion in the instant case, note that statutes of limitation are "'the primary guarantee against bringing overly stale criminal charges,'" *United States v. Marion,* 404 U.S. 307, 322 (1971), the defendant in this case has no statute of limitations protection. For these reasons, I find these precedents unpersuasive.

The proper test of due process assigns to the state the burden of showing a legitimate reason for the prosecutorial delay after a defendant has shown actual prejudice has resulted. Because the state controls the prosecution, the state is obviously better able than a defendant to explain the reasons for prosecutorial delay. Proving another party's motive, especially after an interval of many years, must often be an impossible task. Contrary to the majority's assertion (at pages 903–906), the state should carry the burden on the question of necessity.

*State v. Rivest,* 106 Wis. 2d 406, 316 N.W.2d 395 (1982), upon which the majority relies, does not assign the burden of the second step of this due process test to the defendant. I would overrule *State v. Davis,* 95 Wis. 2d 55, 288 N.W.2d 870 (Ct. App. 1980), which to my mind relies upon, and states, an improper allocation of the burden of proof.

The majority also misstates the subject matter to be proved in step two. It is not the burden of the state to prove absence of bad motives for the delay. Rather, the

state has an affirmative duty to show legitimate reasons for the delay. At that point, it is the duty of the court to balance those reasons against the actual prejudice.

The majority assumes in this case that the defendant has sustained actual prejudice. It can hardly do otherwise in view of the fact that two key defense witnesses have died, medical records are missing, and other witnesses have repeatedly changed their stories. Dr. Wagner's testimony, in particular, would have been of substantial assistance in dispelling an attribution of guilt to Wilson. The resolution of the due process claim in this case rests on the second test.

We do not normally review the exercise of prosecutorial discretion. Nor do I suggest that there are not many legitimate reasons that will justify prosecutorial delay even if a defendant is prejudiced. However, I do believe that the fifth amendment demands that where, as here, a criminal defendant has been actually and substantially prejudiced by the prosecutorial delay, courts must undertake some meaningful review of the exercise of prosecutorial discretion.

The trial court erroneously required the defendant to prove an improper motive for the state's delay in pursuing this prosecution. I would therefore reverse and remand to the trial court to give the state the opportunity to assume its burden of showing what government interest justified the acknowledged prejudice that inured to the defendant as the result of the sixteen-year delay. If the state fails to carry its burden, the prosecution should be dismissed.

I therefore dissent.

I am authorized to state that JUSTICE ABRAHAMSON joins in this dissent.