STATE of Wisconsin, Plaintiff-Respondent,

v.

Edwin J. HAGEN, Defendant-Appellant.†

Court of Appeals

*No. 92–2338–CR. Submitted on briefs June 4, 1993.—Decided January 26, 1994.*

(Also reported in 512 N.W.2d 180.)

†Petition to review denied.

935

936

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Hans P. Koesser*, of Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Maureen McGlynn Flanagan*, assistant attorney general.

Before Brown, Nettesheim and Snyder, JJ.

NETTESHEIM, J.   Edwin J. Hagen appeals from a judgment of conviction for party to the crime of first-degree intentional homicide while using a dangerous weapon pursuant to §§ 940.01 and 939.05(2)(b), STATS. Hagen's life sentence was enhanced by five years pursuant to § 939.63(1)(a)2, STATS., because a dangerous weapon was used in the homicide. Hagen also appeals from an order denying postconviction relief.

On appeal, Hagen raises four issues. First, he argues that his conviction violates his state and federal constitutional protections against double jeopardy because he was previously convicted of federal offenses growing out of the homicide incident and the federal prosecution relied on the same evidence relied upon by the State in this case. Second, Hagen argues that he

was prejudiced by the three-and-one-half year delay between his federal conviction and this state prosecution. Third, Hagen contends that the trial court erred by admitting into evidence and publishing to the jury a photograph of the victim. Fourth, Hagen contends that the prosecutor made inflammatory and prejudicial remarks during the closing argument. We reject all of Hagen's arguments. We affirm the judgment and the postconviction order.

## FACTS

Hagen does not challenge the sufficiency of the evidence. Nonetheless, we recite the facts in some detail to provide the backdrop for our discussion of the appellate issues.

On February 1, 1984, Sanford Gross left his Chicago office at the Heritage Brick Company, telling his secretary that he was going to meet someone who had used bricks for sale. In November 1986, two years and nine months later, Gross' body was found buried in muddy ground along the Soo Line Railroad tracks in Racine County.

Gross was Hagen's stepbrother. Hagen had worked at the brickyard sporadically. William Varellas, a friend of Hagen's, had worked at one time for a salvage yard located on the site of Gross' brickyard. Hagen and Varellas had discussed kidnapping Gross in order to steal or extort money from him. During one of these discussions, Varellas had expressed his willingness to kill Gross if enough money were involved.

On January 30, 1984, two days before Gross' disappearance, Hagen, Varellas and a third man, Mark Whiting, left their homes in Michigan. Whiting understood that he was to help Hagen and Varellas earn some money and he believed that the effort involved

illegal activity. During their drive to Chicago, the three men discussed plans to kidnap a man and force him to write some checks.

On February 1, Varellas lured Gross to an appointment in downtown Chicago by using a false name and representing that he had some used bricks to sell to Gross. When Gross arrived, Varellas and Whiting forced him into the back of a rented U-Haul van. With Hagen following in a separate truck, Varellas and Whiting drove Gross to a suburban Indiana motel where Hagen had previously rented two rooms. Hagen occupied one room while Varellas, Whiting and Gross occupied the other.

Gross was bound, gagged and held hostage in the motel room while Varellas and Whiting forced him to write a note falsely explaining his disappearance. Leaving Whiting to guard Gross, Hagen and Varellas then returned to Chicago and burglarized Gross' place of business. They stole a number of Gross' business checks and left the note which Gross had been forced to write.

When Hagen and Varellas returned to the Indiana motel, Hagen returned to his motel room. Varellas then forced Gross to make payable certain of the stolen checks to an "Anthony Monterusso" and to sign them. The checks totaled $50,000.

The following day, Hagen and Varellas traveled to the Chicago area, again leaving Whiting to guard Gross. Using fraudulent documents identifying himself as "Anthony Monterusso," Varellas successfully cashed the checks which Gross had been forced to sign. Part of the payment for one of the checks was a cashier's check in the amount of $31,500. Hagen and Varellas then returned to the Indiana motel.

During the evening and morning of February 2 and 3, Varellas and Whiting transported Gross, still bound and gagged and now wrapped in a tarpaulin, in the U-Haul to a site in rural Racine County. Hagen followed in his truck. When they arrived at this site, Hagen and Varellas took Gross and two shovels out of the U-Haul. Hagen and Varellas told Whiting to return to the site in about forty-five minutes. Whiting last saw Gross walking between Hagen and Varellas down an abandoned Soo Line Railroad track. When Whiting returned, he picked up Hagen and Varellas and noticed that their shovels were muddy. Gross was not present.

While driving south toward O'Hare Airport, Varellas paid Whiting $5000 and told him to leave the rented van in a parking lot at the airport. Whiting then flew back to Michigan. Hagen and Varellas returned to the Indiana motel and later during the day of February 3, they flew to Las Vegas, Nevada. There, they attempted unsuccessfully to cash the $31,500 cashier's check at the Stardust Hotel.

On February 2, the police were notified of Gross' disappearance and that some of his business checks were missing. On February 4, Varellas was arrested while again attempting to cash the cashier's check at a suburban Chicago bank. Hagen, who had remained outside the bank, was not apprehended. Instead, he returned to Michigan where he assisted Varellas' girlfriend, Janet Tibbitts, in securing Varellas' release on bail.

Varellas was subsequently prosecuted and convicted in Illinois state court proceedings for various offenses related to the stolen checks. These included forgery, perjury and theft by deceptive practice. During this time, 1984-85, the Chicago and federal authorities continued to suspect Hagen and Varellas in Gross' dis-

appearance and a federal grand jury investigated the matter. Tibbitts, Varellas' girlfriend, testified before the grand jury, denying any knowledge of the events surrounding Gross' disappearance and denying that Hagen was involved. However, in later grand jury testimony, Tibbitts recanted her testimony. Tibbitts now implicated Hagen and Varellas, testifying that Hagen had admitted his involvement in Gross' abduction and death to her. Tibbitts also implicated Whiting who had not been previously suspected by the authorities.

As a result of Tibbitts' testimony, the authorities located Whiting in Florida in late January 1986. Whiting agreed to cooperate with the authorities. He accompanied investigators on trips to the various Illinois, Indiana and Wisconsin sites involved. Whiting pointed out the general area in Racine County where he had last seen Gross with Hagen and Varellas. The authorities made a large number of digs in the area but they did not locate Gross' body.

Nonetheless, based on Tibbitts' testimony and the ensuing investigation, Hagen and Varellas were indicted and convicted in the Western District of Michigan on federal charges of conspiracy to kidnap Gross pursuant to 18 U.S.C. § 1201(a) and related offenses. Both were sentenced in December 1986 to 150 years in prison on the conspiracy to kidnap charge, with lesser sentences on other related matters.

In November 1986, following up on a tip from one of Varellas' cellmates, investigators found Gross' body buried along the Soo Line Railroad tracks in Racine County. The authorities also found a crowbar buried under Gross' body. The site of the discovery was near the area Whiting had last seen Gross. Following this development, Racine County authorities conducted forensic examinations and testing that eventually led

to a positive identification of Gross' body and the determination that Gross had died from one or more blows to the back of his skull. The crowbar was the likely lethal weapon.

In March 1987, state authorities from Michigan, Illinois and Wisconsin and federal authorities met to discuss the matter. The authorities agreed that Wisconsin should have the first opportunity to prosecute any state murder charges. The matter was assigned to Racine County Assistant District Attorney Eric Guttenberg who reviewed a large volume of police reports and other materials related to the case. Guttenberg eventually drafted a criminal complaint, but he did not file it. Guttenberg testified at the postconviction proceedings that while he did not delay the filing, he also had no sense of urgency regarding the matter because of the substantial sentences imposed against Hagen in the federal case. Guttenberg left the district attorney's office in September 1987.

The record is silent concerning any further police or prosecutorial action in this case until August 1, 1989, when the matter was assigned to Assistant District Attorney Michael Nieskes who had joined the district attorney's office some two months earlier. Over the next four months, Nieskes reviewed the substantial materials pertaining to this case, worked on locating witnesses, and sought to obtain the release of federal court materials which had been frozen in light of pending federal appeals. Nieskes filed the criminal complaint in this matter on December 28, 1989.

Hagen and Varellas were tried separately and both were convicted of first-degree intentional homicide. Both separately appeal. We now move to Hagen's appellate issues.

## DOUBLE JEOPARDY: *GRADY V. CORBIN*

Hagen argues that the federal prosecutions against him for conspiracy to kidnap Gross and related offenses bar this state homicide prosecution on double jeopardy grounds. Hagen's argument is premised upon the United States Supreme Court's decision in *Grady v. Corbin*, 495 U.S. 508 (1990), *overruled by United States v. Dixon*, 509 U.S. —, 113 S. Ct. 2849 (1993).[1] In *Grady*, the Supreme Court held that a subsequent prosecution is prohibited "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Grady*, 495 U.S. at 510.

However, in the recent decision of *Dixon*, the Supreme Court overruled *Grady*. The *Dixon* Court concluded that *Grady*'s "same-conduct" rule was "wholly inconsistent" with earlier Supreme Court precedent and with the common law. *Dixon*, 509 U.S. at —, 113 S. Ct. at 2860. The Court also noted that *Grady* "was not only wrong in principle; it has already proved unstable in application." *Id.* at —, 113 S. Ct. at 2863. *Dixon* thus returns a double jeopardy analysis to the "elements only" test set out in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). And recently the Wisconsin Supreme Court followed *Dixon* in a successive prosecution case. *State v. Kurzawa*, 180 Wis. 2d 502, 509 N.W.2d 712 (1994).[2]

---

[1] We observe that the Supreme Court decided *United States v. Dixon*, 509 U.S. —, 113 S. Ct. 2849 (1993), after the briefing before this court was completed.

[2] The question remains as to the reach of *State v. Kurzawa*, 180 Wis. 2d 502, 509 N.W.2d 712 (1994). The *Kurzawa* court

Hagen obviously can make no claim that the elements of first-degree intentional homicide are congruent with the federal offense of conspiracy to kidnap. We thus reject his federal double jeopardy claim.

██

Hagen also urges that if we reject his *Grady* premised argument, we should nonetheless accord greater double jeopardy protections under Article I, § 8 of the Wisconsin Constitution and declare this prosecution invalid. However, we are powerless to do so. Our supreme court has held that double jeopardy questions under the Wisconsin Constitution are governed by applicable decisions of the United States Supreme Court. *State v. Rabe*, 96 Wis. 2d 48, 61 n.7, 291 N.W.2d 809, 815 (1980). The *Kurzawa* court reaffirmed this principle. *Kurzawa*, 180 Wis. 2d at 523, 509 N.W.2d at 721. Since Hagen's double jeopardy argument is *Grady* based, and with *Dixon* overruling *Grady* and *Kurzawa* confirming *Dixon*'s application under the Wisconsin Constitution, we reject Hagen's double jeopardy argument. Hagen's argument is more properly addressed to our supreme court.

## PRE-ARREST DELAY

██

Hagen contends that the State's pre-arrest delay in commencing this criminal prosecution violated his

---

acknowledged that "[T]he *Dixon* majority returned to *Blockburger's* same elements' test for virtually all double jeopardy questions." *Kurzawa*, 180 Wis. 2d at 509, 509 N.W.2d at 715. However, later the *Kurzawa* court stated: "We hereby follow the United States Supreme Court and adopt the analysis of *Dixon* and *Blockburger* in double jeopardy cases *involving successive prosecutions*. *Kurzawa*, 180 Wis. 2d at 525, 509 N.W.2d at 722 (emphasis added).

right to due process of law. However, the Wisconsin Supreme Court has held:

> Where a defendant seeks to avoid prosecution based upon prosecutorial delay, it is clear that it must be shown that the defendant has suffered actual prejudice arising from the delay and that the delay arose from an improper motive or purpose such as to gain a tactical advantage over the accused.

*State v. Wilson*, 149 Wis. 2d 878, 904-05, 440 N.W.2d 534, 544 (1989) (citation omitted).

Hagen persuasively argues that this case demonstrates "prosecutorial negligence or indifference" or "reckless disregard" by the prosecutor. However, Hagen does not contend that the State's delay in this case stemmed from the kind of "improper" prosecutorial motive or conduct required by *Wilson*. Instead, he urges this court to extend *Wilson* to such instances.

■

Again, Hagen's request is beyond the power of this court.[3] We are bound by the level of prosecutorial misconduct proscribed by *Wilson*. That level is not present in this case. If the *Wilson* standard is to be broadened to take in the prosecutorial negligence likely demonstrated in this case, the Wisconsin Supreme Court must change the law to so say. Hagen's argument should be directed to that court.[4]

---

[3] This is so even if Hagen is correct that in *State v. Wilson*, 149 Wis. 2d 878, 440 N.W.2d 534 (1989), the Wisconsin Supreme Court misinterpreted the United States Supreme Court precedent on which it relied.

[4] In light of our holding that Hagen has failed to demonstrate the level of prosecutorial misconduct required by *Wilson*, we need not address the prejudice prong of the *Wilson* test.

## EVIDENTIARY RULING

The trial court allowed the State to introduce into evidence and to publish to the jury a photograph of Gross and his dog. The photograph came into evidence during the testimony of Whiting, who identified Gross from the photograph. Hagen contends that the State's sole purpose in using the photograph was to evoke sympathy from the jury. [5]

Whether photographs are displayed to the jury is discretionary with the trial judge. *State v. Thompson*, 142 Wis. 2d 821, 841, 419 N.W.2d 564, 571 (Ct. App. 1987). We will uphold the trial court's discretion unless it is wholly unreasonable or the only purpose of the photographs is to inflame and prejudice the jury. *Id.*

Here, the trial court determined that the photograph was not inflammatory. The court said, "In reality the photograph is [a] very normal photograph of a person, in this case a person with his dog." We agree. While the presentation of any evidence recalling or identifying the victim in a homicide case will likely evoke a degree of sympathy with a jury, we agree with the trial court that this ordinary photograph did not work any *undue* sympathy.

Moreover, the State had to establish that Gross was the victim. While the State had expert forensic

---

[5] The State contends that the only issue preserved for appellate review is the publication of the photograph to the jury, not the receipt of the photograph into evidence. Because the issues are so inextricably related and because we nonetheless conclude that the trial court did not misuse its discretion, we choose not to invoke any waiver against Hagen.

evidence to assist in this effort, certainly Whiting's identification testimony using the photograph was also helpful on this point. As such, the evidence was relevant and admissible. And, given the neutral and noninflammatory nature of the photograph, we also conclude that the court's publication of the exhibit to the jury was not "wholly unreasonable" under *Thompson*. We uphold the trial court's discretionary rulings regarding this exhibit.[6]

## PROSECUTOR'S REBUTTAL CLOSING ARGUMENT

During the course of his rebuttal closing argument, the prosecutor made the following statement:

> [T]he defendant through his three attorneys is trying to [sic] smoke and mirrors and whatever other tricks they can pull out of their sleazy bag and that's what you've seen. Bob Finen, Jennifer Bias, Sean Brown, playing a tape that he can't get into evidence. . ... This is a murder case. Emotions run high, but that is no excuse for unethical behavior.

Hagen objected to these remarks. Outside the presence of the jury, the trial court ruled that the words "sleazy bag" and "unethical behavior" were improper. The court allowed the balance of the statement to stand. Upon the jury's return, the court instructed the jury to disregard the remarks it had ruled improper. Concurrent with this ruling, the court also told the jury,

---

[6] We further observe that the presence of Gross' dog in the photograph also had some relevancy to the facts of the offense. Whiting's testimony established that Hagen and Varellas were concerned about a watchdog which Gross kept at the brickyard business office.

"You're to focus on the evidence and review of the evidence and not have appeals to prejudice or bias."

Hagen did not move for a mistrial based upon this line of argument.[7] Instead, by postconviction motion, Hagen asked for a new trial based upon these events. The trial court rejected this request, concluding that its curative action taken at the time had defused the situation and that Hagen's right to a fair trial had not been compromised.

■

We agree. The trial court's admonition to the jury was warranted and correct. We presume that the jury follows the instructions given to it. *State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432, 436 (Ct. App. 1989). We also note that the court's remarks at the postconviction hearing put this episode in its proper context. Speaking both to the parties and to us, the court stated:

> There were comments made during the course of the trial by both sides, and I think they were dealt with and there was an effort to try to focus on the facts as there should be. But I want to make one finding here, because I think it will be helpful to the Appellate Court. . . .. Nothing in the context of this trial as opposed to another trial rose to the level of indicating that either for the State or the defense fundamental fairness was being intruded upon. What occurred is some unfortunate statements by attorneys. . . . But nothing in any of those comments rose to the level of creating something that would interfere with fundamental fairness in the trial itself.

---

[7] Hagen did ask for a mistrial based upon other arguments of the prosecutor. Those matters are not before us on this appeal.

We agree with the State that the extent to which this court should defer to a trial court's ruling denying a new trial in the interest of justice under § 805.15(1), STATS., is not entirely clear. *See, e.g., State v. Harp*, 161 Wis. 2d 773, 782, 469 N.W.2d 210, 214 (Ct. App. 1991). Nonetheless, the trial court clearly has an advantage over us in assessing the impact and effect of improper attorney argument on the outcome of the proceedings.

Given the trial court's swift and appropriate curative action, the presumption that the jury followed the court's curative instruction, and the court's own assessment of the offending conduct, we conclude that a new trial is not warranted in this case.

We affirm the judgment of conviction and the order denying Hagen's request for a new trial.

*By the Court.*—Judgment and order affirmed.