STATE of Wisconsin, Plaintiff-Respondent,

v.

Douglas A. JOHNSON, Defendant-Appellant.†

Court of Appeals

*No. 85–1252–CR. Argued March 20, 1986.—Decided December 17, 1986.*

(Also reported in 400 N.W.2d 502.)

---

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the defendant-appellant, the cause was submitted on the briefs of *Glenn L. Cushing*, assistant state public defender. Oral argument by *Mr. Cushing*.

For the plaintiff-respondent, the cause was submitted on the brief of *Bronson C. La Follette*, attorney general and *Barry M. Levenson*, assistant attorney general. Oral argument by *Mr. Levenson*.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

SCOTT, C.J. Douglas A. Johnson (Johnson) appeals from his conviction by a jury for second-degree murder contrary to sec. 940.02, Stats. He also appeals from the order denying his post-conviction motion. Johnson raises three issues on appeal: (1) whether there is sufficient evidence to support the conviction of second-degree murder; (2) whether the trial court committed prejudicial error by giving a *falsus in uno* instruction after informing the parties that such an instruction would not be given; and (3) whether the combined effect of the foregoing alleged errors entitles the defendant to a new trial in the interests of justice. Because we conclude that there is sufficient evidence to support the conviction and that the giving of the *falsus in uno* instruction was not prejudicial error, we affirm.

In order to be convicted of second-degree murder, the evidence must show that the accused's conduct was: (1) imminently dangerous to another; (2) of such a character that it evinced a depraved mind, regardless of life; and (3) the cause of the victim's death. Sec. 940.02, Stats.

Johnson contends that the evidence fails to show that the nature of the conduct which caused Shannon Eick's death was "conduct imminently dangerous to another" or that his conduct "evinced a depraved mind." He argues that the evidence fails to prove the specific act or particular conduct in which he engaged and the existence of the specific state of mind necessary for a second-degree murder conviction.

The state must prove each element of a crime beyond a reasonable doubt. *Turner v. State*, 76 Wis. 2d 1, 10, 250 N.W.2d 706, 711 (1977). When the defendant challenges the sufficiency of the evidence, our standard of review is whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *State v. Koller*, 87 Wis. 2d 253, 266, 274 N.W.2d 651, 658 (1979). It is not necessary that this court be convinced of the defendant's guilt. *Id.* Rather, this court need only be satisfied that the jury, acting reasonably, could be so convinced. *Id.* Thus, as we view it, "if any possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we will not overturn a verdict even if we believe a jury *should* not have found guilt based on the evidence before it." *State v. Alles*, 106 Wis. 2d 368, 377, 316 N.W.2d 378, 382 (1982) (emphasis in original).

A conviction may be based in whole or in part upon circumstantial evidence. *Koller*, 87 Wis. 2d at 266, 274 N.W.2d at 658. The test for circumstantial evidence is whether it is strong enough to exclude every reasonable hypothesis of innocence. *Id.* The test for determining when circumstantial evidence satisfies the reasonable doubt burden of proof is as follows:

> [T]hat all the facts necessary to warrant a conviction on circumstantial evidence must be consistent with each other and with the main fact sought to be proved and *the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty* that the accused and no

other person committed the offense charged. [Emphasis added.]

*State v. Charbarneau*, 82 Wis. 2d 644, 655–56, 264 N.W.2d 227, 233 (1978) (quoting *State ex rel. Hussong v. Froelich*, 62 Wis. 2d 577, 586, 215 N.W.2d 390, 396 (1974)). This test raises a *"question of probability, not possibility." See Stewart v. State*, 83 Wis. 2d 185, 192, 265 N.W.2d 489, 492 (1978) (emphasis in original) (quoting *State v. Shaw*, 58 Wis. 2d 25, 29, 205 N.W.2d 132, 134 (1973)).

Appellate courts have recognized the necessity for extensive reliance on circumstantial evidence in prosecutions involving child victims. In *Schleret v. State*, 311 N.W.2d 843, 844–45 (Minn. 1981), the Minnesota Supreme Court analyzed the problem as follows:

> "Battered child syndrome" can be evidenced by multiple injuries in various stages of healing. Before one injury heals, another injury occurs. Examples of such successive injuries include bruises, burns, and fractures. . . .
>
> . . . .
>
> Much of the evidence that can be gathered to show an instance of "battered child syndrome" is circumstantial. In allowing such evidence to support a conviction, this court has recognized that those felonious assaults are in a unique category. Most cases of felonious assault tend to occur in a single episode to which there are sometimes witnesses. By contrast, cases that involve "battered child syndrome" occur in two or more episodes to which there are seldom any witnesses. In addition, they usually involve harm done by those who have a duty to protect the child. The harm often occurs when the child is in the exclusive control of a parent. Usually the child is too young or too intimidated to testify as to

what happened and is easily manipulated on crossex-amination. *That [a] child ... [does] not survive, strengthens, rather than diminishes, the law's concern for the special problems of prosecuting a defendant in a "battered child" case.* As background, direct testimony of earlier episodes of harm done to the child is admissible.

Crucial to identifying such cases are the discrepancies between the parent's version of what happened to the child when the injuries occurred and the testimony of medical experts as to what could not have happened, or must have happened, to produce the injuries. [Emphasis added.]

We read *Schleret* as being consistent with, and a logical extension of, *State v. Hooper*, 101 Wis. 2d 517, 305 N.W.2d 110 (1981), which holds that in proving criminal conduct in second-degree murder cases, "the qualities of conduct" necessary for a conviction are found "in the act itself *and the circumstances of its commission.*" *Hooper*, 101 Wis. 2d at 542, 305 N.W.2d at 122–23 (emphasis in original) (quoting *State v. Olson*, 75 Wis. 2d 575, 582, 250 N.W.2d 12, 16 (1977)). We now turn to a review of the evidence to determine "if any possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt." *Alles*, 106 Wis. 2d at 377, 316 N.W.2d at 382 (emphasis in original).

Dr. Harold Danforth was the emergency room physician on duty when Shannon was admitted at 10:25 p.m. Dr. Danforth's testimony can be summarized as follows: (1) when he examined Shannon he found her to be pulseless and not breathing; (2) he found no external bleeding but did find bruises that were a few days old on her forehead, chest, both sides of her neck and abdomen, and a fresh abrasion on her knee; (3) he pro-

nounced Shannon dead at 10:30 p.m.; and (4) because of the numerous bruises, he suspected possible child abuse and ordered an autopsy.

Dr. Robert Huntington, a forensic pathologist, performed the autopsy on Shannon. Dr. Huntington's testimony about his external examination of Shannon can be summarized as follows: (1) he found a large number of bruises scattered around the head, neck, trunk, chest and abdomen of Shannon's body; (2) he opined that this child had "way out of the normal amount" of bruises than the typical child would have; and (3) he did not find any evidence indicating that she was an "easy bruiser."

Dr. Huntington's testimony about his internal examination of Shannon can be summarized as follows: (1) he found a bruise on her right arm, ranging from being a few hours to a day or day and a half old; a "very fresh" bruise on her left arm, a few minutes to a few days old; an older bruise deep in her scalp, possibly up to three weeks old; a bruise around her belly button, not evident on her skin, but "quite fresh"; and a bruise in the middle of her back, a few hours to a day and a half old; (2) he acknowledged that, while the bruising on her arms could have come from someone shaking the child within the last few hours of her life, as Johnson claimed he did in order to revive her, he believed that the bruises were not a factor in her death; and (3) he observed an outpouring of blood from the peritoneal cavity and a torn mesentery, resulting in a loss of three-fifths of a pint of blood.

Dr. Huntington's testimony regarding the cause of Shannon's death can be summarized as follows: (1) he concluded that it was "a blunt force injury that tore this mesentery and from which she bled to death"; (2) the

459

force had to be "a concentrated force" because the liver and spleen were not damaged as they would be if a person's abdomen had hit a broad surface, as in a car accident; (3) the vector or direction of the force was heading up into the abdomen and towards her back; (4) he estimated that this tear was a "quite recent injury" which would have had to occur within "four hours from the point of death" but that an injury such as this kind could kill "within a few minutes," this being the minimum amount of time from injury to death. He based this opinion on the medical fact that Shannon could not have survived the amount of blood she lost for a very long time; and (5) while stating that he was not sure "whether the child slammed into something or whether something slammed into the child," he did state that the kinds of objects which would have caused the concentrated force could have been "a fist or a foot or some solid object." Dr. Huntington indicated that the solid object also could have been "[o]ne of these big old fashioned round bannister ends, . . . [a] corner of a table or something like that . . . ." He said, in layman's terms, that a concentrated force comparable to what Shannon experienced would result from a fifty or sixty miles per hour head-on collision.

With regard to this kind of injury resulting from a fall down the stairs, Dr. Huntington testified that: (1) he could conceive of an accident *only if* "she had been dropped straight down a stairwell from a ceiling on the second floor down [on] one of those old fashioned bannisters, down to the first level," or if she dropped fifteen feet straight down with no blocks or tumbles; in contrast, a "normal fall" would result in one's "hitting broad rises [sic]" and such a fall would "distribute the injuries differently"; and (2) because a normal tumble

down the stairs just would not have "that much power or thrust," he concluded that there was "[n]o way" that her injury resulted from an accident"; however, he did acknowledge on cross-examination that Shannon's injury could have been caused by "someone grabbing the child to throw the child somewhere;" however, he said that it would have had to be "a severe shaking process" for the injury to have occurred in this way.

Last, Dr. Huntington testified that there was no way such an injury could have been ongoing for a two-week period, the length of time it was alleged that Shannon had the flu. He testified that this injury would lead to an immediate onset of pain, followed by shock and then severe bleeding, at which time the child might get thirsty and start acting a little peculiar, then become unconscious and die.

Other witnesses testified as to Johnson's behavior the night of Shannon's death. Michael Novotny was the detective who took Johnson's statement. During the course of the interview, Novotny testified that Johnson said over and over again, "I killed her," but that Johnson did not want those words included in his statement. Novotny admitted when cross-examined, however, that his report included a statement of clarification that Johnson, in fact, had said he had killed Shannon "because she wasn't breathing."

Lieutenant Thomas Kutcher of the fire department testified that he believed "the actions of . . . [Johnson] did not seem to [him] to be the usual actions or concerns of a parent with a child in that situation." He testified that he based this observation on the fact that Johnson paced in the rooms of the house, went out the front door, went upstairs and carried down another

461

child. This child, Amber Johnson, had been asleep upstairs.

Shannon's mother, April Eick, testified that Shannon had been sick with the flu for two weeks, vomited every couple of days and would not eat; however, she did eat the cereal she was given the night she died. Eick testified that Shannon bruised easily; for example, her cheek would bruise, according to Eick, when she combed Shannon's hair. She admitted that she and Johnson had had minor temporary separations during the last couple of years they had been living together and that Johnson once slapped her in the face and pushed her down onto the couch.

Tina Hartzheim, April's sister-in-law and Shannon's aunt, testified to seeing bruises on Shannon, twice in January and once in February, but had no personal knowledge of how they occurred. She testified, however, to seeing Shannon fall off a rocking horse at her house one day and have bruises from the fall the next day. Barbara Hartzheim, Shannon's grandmother, also testified to seeing bruises on Shannon but said she had never noticed whether or not Shannon bruised easily, even though she had the child with her often.

Johnson testified as to his version of Shannon's injuries. He said that during Eick's absence, he was painting in a hallway leading to the basement when he heard "a rumble, rumble, crash," whereupon he came upstairs and found Shannon sitting on the living room floor, leaning against the TV which allegedly had been moved approximately one and a half feet by her fall. He further testified that after Shannon said she had fallen down the stairs, she intermittently phased in and out of consciousness and finally lapsed into unconsciousness. This fall allegedly occurred on the stairway which

462

extended from the second floor, where she had gone to the bathroom, down ten steps to a platform, and then down eight more steps to the first floor. She purportedly collided with and knocked over the preventive gate blocking the bottom of the stairway. Her fall allegedly caused the gate to be pushed five feet from the bottom of the stairway.

Johnson's testimony regarding what allegedly occurred after Shannon's fall related the following events. Before Shannon ultimately lapsed into unconsciousness, Johnson repeatedly attempted to keep her conscious. While Shannon was still conscious, but dazed, she took a couple of steps and then collapsed. Johnson placed Shannon at the coffee table to finish her cereal, but her head fell forward into the bowl and then she fell to the floor. He then laid Shannon on the couch and massaged her knee, which she said hurt, yelled at her several times and then asked her to identify how many fingers he had held up. She answered him correctly, but then lapsed back into unconsciousness. Johnson gave her a Popsicle which she gulped down. After fifteen to twenty minutes of this routine, Johnson ran to a neighbor's house to make a 911 call, but no one was home. When Johnson returned home, he screamed at Shannon to rouse her and then slapped her in the face, but, for the most part, her eyes kept rolling. He again ran to the neighbor's house in vain, returned home and slapped her again to rouse her. At this point, Johnson put Shannon in bed upstairs and ran to a pay phone near his home and called for help at 9:48 p.m. While waiting for the paramedics, Johnson shook Shannon's limp body up and down with no success and finally laid her on the floor for the paramedics to examine.

Johnson also testified that he was like "a second father" to Shannon and worked on fixing up the house for Eick, Shannon and Amber. When questioned by his own attorney, Johnson admitted that, in fact, he had lied twice. First, he lied to the county welfare department about Eick and Shannon's absence from his apartment for three weeks when they were still living with him in order to collect food stamps. He also lied about his legal claim of paternity for Amber Johnson at the district attorney's office, a claim not made as he first stated because of fatherly concern (even though he was biologically her father), but to receive aid.

Johnson places great reliance upon *Seidler v. State*, 64 Wis. 2d 456, 219 N.W.2d 320 (1974), to support his contention that there is insufficient evidence to prove that the nature of his conduct was "imminently dangerous" or "evinced a depraved mind." In our view, *Seidler* is readily distinguishable on its facts.

In *Seidler*, all of the evidence was consistent with the defendant's version of his having angrily grabbed the child by the arm and throwing her into the bedroom where she fell over the bed and hit her stomach. *Seidler*, 64 Wis. 2d at 463, 219 N.W.2d at 324. Accepting the defendant's version of what had occurred, the supreme court held that his conduct was not "imminently dangerous" so as to serve as the basis for a conviction for second-degree murder. *Id.* at 464, 219 N.W.2d at 325.

In this case, the jury was free to totally ignore Johnson's testimony as to what occurred. We agree with Johnson that this alone, however, does not establish that his conduct was imminently dangerous to another and evincing a depraved mind, regardless of human life. We must examine the remaining evidence to determine whether such evidence, believed and rationally consid-

ered by the jury, is sufficient to circumstantially establish the elements of second-degree murder. We conclude that it does.

■

Circumstantial evidence must be sufficiently strong to exclude every reasonable theory of innocence before it can legitimately support a criminal conviction. *Charbarneau*, 82 Wis. 2d at 655, 264 N.W.2d at 233. In this case, we construe this to mean those theories by which Shannon's death could be attributed to accident or criminal circumstances which are short of second-degree murder. This test, however, has been described as one of probability, not possibility. *Id.*

After considering the evidence as a whole, and especially the medical testimony, the jury could eliminate accident or misadventure as a reasonable hypothesis of innocence. The only suggestion in this record as to such circumstances is Johnson's testimony that Shannon told him she had fallen down the stairs. The expert testimony, coupled with the surrounding circumstances, totally contradicts such an account and arguably places such a theory beyond the realm of possibility.

■

As to other circumstances of death short of second-degree murder, we are satisfied that "the jury *could* have drawn the appropriate inferences from the evidence adduced at trial," *Alles*, 106 Wis. 2d at 377, 316 N.W.2d at 382 (emphasis in original), to conclude that these do not fall within the realm of probability as required by the law of circumstantial evidence. Johnson was in exclusive control of Shannon at the time of her death. The circumstances attendant to Shannon's death required the administration of a force or blow equivalent to a fifty or sixty miles per hour head-on collision.

The force would have to be delivered in a blunt fashion, upward into the abdomen and towards the back. Examples of an object capable of delivering the type of injury resulting from the requisite force would be "a fist, foot or some solid object." The evidence reveals no instrument or person other than Johnson who could have delivered such a blow with such attendant force in such a strategic direction and location. After weighing all of the evidence, the jury could properly find that there was no other reasonable conclusion but that Johnson was the instrument of Shannon's death under circumstances constituting second-degree murder.

Johnson next argues that the giving of the *falsus in uno* instruction deprived him of a fair trial because its use shifted the burden of proof, interfered with his right to testify in his own defense and singled him out for derogatory treatment.[1]

We are aware that the supreme court has criticized the use of this instruction. *See State v. Williamson*, 84 Wis. 2d 370, 395, 267 N.W.2d 337, 349 (1978). However, we are unaware of a single case that when the facts supported the giving of the instruction, an appellate court has held that the use of the instruction was error. We are satisfied on the facts of this case that the giving of the instruction was not error. Appellate courts should

---

[1] During an instruction conference, the state requested that the court give the *falsus in uno* instruction and the court, *sua sponte*, declined giving it on the basis that the other instructions adequately covered credibility and that the instruction was not generally favored by the courts. However, the court included standard instruction 305 when the instructions were given to the jury. The record does not reflect whether it was given by inadvertence or because the court had changed its mind.

not consider a single instruction in isolation but should view the instructions as a whole. *State v. Hedstrom*, 108 Wis. 2d 532, 536, 322 N.W.2d 513, 516 (Ct. App. 1982). After reviewing the instructions in their entirety, we are satisfied that the giving of the *falsus in uno* instruction did not deprive Johnson of a fair trial.

Johnson's final argument is that he is entitled to a new trial in the interests of justice. Because we are not convinced that there has been a probable miscarriage of justice, that the defendant should not have been found guilty or that a new trial would lead to a different result, we affirm. *State v. Lederer*, 99 Wis. 2d 430, 445, 299 N.W.2d 457, 465 (Ct. App. 1980).

*By the Court.*—Judgment and order affirmed.