STATE of Wisconsin, Plaintiff-Respondent,

v.

Arden C. HIRSCH, Defendant-Appellant.

Court of Appeals

*No. 01–0023–CR. Oral argument October 17, 2001.—Decided November 21, 2001.*

2002 WI App 8

(Also reported in 640 N.W.2d 140.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Suzanne Hagopian*, assistant state public defender of Madison. There was oral argument by *Paul G. LaZotte*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David J. Becker*, assistant attorney general, and *James E. Doyle*, attorney general. There was oral argument by *David J. Becker*.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Arden C. Hirsch appeals

from his conviction by a jury for second-degree murder contrary to Wis. Stat. § 940.02 (1969).[1] The sole issue on appeal is whether there is sufficient evidence to support the conviction of second-degree murder. Because we conclude that there is sufficient evidence to support the conviction, we affirm.

¶ 2. In order to be convicted of second-degree murder, the evidence must show that the accused's conduct was: (1) imminently dangerous to another; (2) of such a character that it evinced a depraved mind, regardless of life; and (3) the cause of the victim's death. Wis. Stat. § 940.02.

¶ 3. Hirsch contends that the evidence fails to show that the nature of the conduct which caused his daughter Laurie Hirsch's death was "conduct imminently dangerous to another" or that his conduct "evinced a depraved mind." He argues that the evidence fails to prove the specific act or particular conduct in which he engaged and the existence of the specific state of mind necessary for a second-degree murder conviction.

---

[1] This case is decided under the version of the statutes applicable at the time of the occurrence that led to Hirsch's conviction. WISCONSIN STAT. § 940.02 (1969) states:

> **Second-degree murder.** Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years.

All further references to the Wisconsin Statutes are to the 1969 version.

## Standard of Review

¶ 4. The State must prove each element of a crime beyond a reasonable doubt. *State v. Johnson*, 135 Wis. 2d 453, 456, 400 N.W.2d 502 (Ct. App. 1986). When the defendant challenges the sufficiency of the evidence, our standard of review is whether the evidence adduced, believed and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. *Id.* It is not necessary that this court be convinced of the defendant's guilt. *Id.* Rather, this court need only be satisfied that the jury, acting reasonably, could be so convinced. *Id.* Thus, if any possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, we will not overturn the verdict even if we believe a jury *should* not have found guilt based on the evidence before it. *Id.*

¶ 5. A conviction may be based in whole or in part upon circumstantial evidence. *Id.* The test for circumstantial evidence is whether it is strong enough to exclude every reasonable hypothesis of innocence. *Id.* Circumstantial evidence satisfies the reasonable doubt burden of proof when all the facts necessary to warrant a conviction on circumstantial evidence are consistent with each other and with the main fact sought to be proved and the circumstances taken together are of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged. *Id.* at 456–57.

¶ 6. Hirsch's conviction was based on circumstantial evidence. It is well recognized that there is a

761

particular need to rely extensively on circumstantial evidence in prosecutions involving child victims. *Id.* at 457. In *Johnson,* a "battered child syndrome" case,[2] we adopted some applicable reasoning from the Minnesota Supreme Court. *Id.* Like Hirsch, Johnson was convicted of second-degree murder of a child and he appealed, arguing that there was insufficient evidence to support his conviction. *Id.* at 455. Johnson was a live-in boyfriend of the child's mother and was home alone with the victim. *Id.* at 462–63. Johnson testified as to his version of the events that led up to the child's injuries. *Id.* at 462. He said that he was painting in a basement hallway when he heard a crash whereupon he came upstairs and found the child sitting on the living room floor. *Id.* He testified that the child said she had fallen down the second story stairs. *Id.* He said that the child then phased in and out of consciousness and eventually, after attempting to rouse the child, he went to a pay phone and called 911. *Id.* at 462–63. The emergency room doctor and a forensic pathologist testified. *Id.* at 458–59. The emergency room doctor said he suspected child abuse after examining the victim. *Id.* The forensic pathologist who examined the body testified that the child suffered from a blunt force injury and said there was "no way" that her injury resulted from an accident. *Id.* at 459–61.

¶ 7. The case before us involves issues similar to those in the *Johnson* case because both are child victim cases. In *Johnson,* we noted that the harm often occurs when the child is in the exclusive control of a parent. *Id.*

---

[2] "Battered child syndrome" can be evidenced by multiple injuries in various stages of healing. Before one injury heals, another injury occurs. Examples of such successive injuries include bruises, burns and fractures. *State v. Johnson,* 135 Wis. 2d 453, 457, 400 N.W.2d 502 (Ct. App. 1986).

at 457. Usually the child is too young or too intimidated to testify as to what happened and is easily manipulated on cross-examination. *Id.* at 457–58. That a child *does not survive* strengthens, rather than diminishes, the law's concern for the special problems of prosecuting a defendant in a "battered child" case. *Id.* at 458. Crucial to identifying a case in which a child is victimized by a parent are the *discrepancies between the parent's version of what happened to the child when the injuries occurred and the testimony of medical experts as to what could not have happened, or must have happened, to produce the injuries. Id.*

¶ 8. The reasoning in *Johnson* is applicable here because, like the battered child syndrome cases that result in the death of a child, this child victim case resulted in the death of a child. Like those cases, this case concerns a harm that occurred when the child was in the exclusive control of her parent. And, finally, as in the battered child cases, the fact that a child did not survive strengthens, rather than diminishes, the law's concern.

¶ 9. We now turn to a review of the evidence to determine "if any possibility exists that the jury *could* have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt." *Id.*

■

¶ 10. On December 2, 1970, Hirsch's wife, Patricia Campbell,[3] put their three children to bed and went Christmas shopping. Hirsch was in charge of the children. Later that evening, Hirsch asked his downstairs neighbor, Allen Mohs, to drive him and his one-month-old baby, Laurie, to the hospital. Mohs testified that

---

[3] Hirsch and Campbell separated in 1978, approximately eight years after Laurie Hirsch's death. Campbell died in 1997.

Hirsch told him that Hirsch's two-year-old daughter Melissa had hit Laurie over the head and that Laurie's head was swelling up. Mohs drove Hirsch and Laurie to the hospital, dropping them off at the emergency room.

¶ 11. At 8:45 p.m., Laurie was seen by the hospital's emergency room physician, Dr. M. Ali Madani. According to Dr. Madani's report, Laurie had swelling on the right side of the head and was in respiratory failure. She was pronounced dead at 9:50 p.m. The coroner, Richard Suscha, examined Laurie's body and found the right side of the head swollen and soft. Suscha talked to Hirsch in the hospital lobby after Laurie had died. According to Suscha, Hirsch said that his two-year-old daughter had struck Laurie with a book while they were on the sofa and that later, when Laurie developed difficulty breathing, he took her to the hospital.

¶ 12. An autopsy was performed by Dr. James Jaeck. Doctor Jaeck did not testify at trial and his entire autopsy report was never found. However, the State introduced into evidence the coroner's docket that had attached to it a portion of Dr. Jaeck's autopsy report. Doctor Jaeck concluded that Laurie suffered a head trauma "severe enough to have caused death." In his opinion, the injury "was less than 12 hours old and resulted from either a blow or a fall." He found a large skull fracture, along with bleeding and herniation of the brain. He suggested that there was "child negligence involving the parents, whether active or passive."

¶ 13. As was the coroner's usual practice with any unexpected death, Suscha notified the police the following morning. He heard nothing from the police for the next twenty-six years.

¶ 14. A criminal investigation began in 1996 when Campbell contacted the Lincoln county coroner to

request that Laurie's body be exhumed because Campbell was dying of cancer and wanted to have the body interred with her.[4] After reviewing Laurie's records, the Lincoln county coroner asked the Sheboygan police to investigate. Detective Donald A. Sorenson was assigned to investigate Laurie's death.

¶ 15. As part of the investigation, Sorenson taped one telephone conversation between Hirsch and Campbell and two telephone conversations between Hirsch and his daughter Melissa. Campbell and Melissa consented to the recordings, but Hirsch did not know the conversations were being recorded.

¶ 16. The tapes were played at trial.[5] The first tape, made on November 25, 1996, documented the conversation between Hirsch and Campbell. In response to Campbell's questions, Hirsch told Campbell differing versions of what had occurred that night. He said:

> I was there, yes, but I left for a little while . . . Melissa and them were there. I just went out. *I just went down to the neighbors . . . and I went down to talk to him. I wasn't gone five minutes . . . five or ten minutes and when I got back upstairs, I put her to bed,* I gave her her bath cause you and Kathy went shopping . . . and I put her to bed and she was just fine and then all of a sudden I couldn't, it was like she was gasping for breath and I thought maybe she had something in her throat or something, you know, so I took her, I, I, you know I picked her up and I patted her on the back and that stuff and she still was gasping for breath and so that's

---

[4] In 1996, Hirsch and Campbell had been separated for almost twenty years; Hirsch lived in Lincoln county where Laurie was buried and Campbell lived in Fox Lake, Illinois.

[5] The tapes are in the appeal record as are transcripts of the tapes.

when I tried to get a hold of you and I believe, I don't know, did neighbors downstairs take me in, yeah . . . yeah the neighbors. . . . (Emphasis added.)

Campbell then asked Hirsch why he was not at the hospital when she arrived at the hospital that night. Hirsch said he had left the other children home alone because he had to get Laurie to the hospital. He said that he then "had to leave [Laurie at the hospital] 'cause the kids were home alone." Campbell said that she remembered Hirsch telling her that Melissa had hit Laurie on the head. Hirsch replied, "That could have happened. I don't know for sure. I have no idea for sure."

¶ 17. Hirsch acknowledged that Laurie was fine when Campbell left that evening. He remembered that Campbell had put the children to bed before she left, but said that they had woken up after she left and he played with them on the floor. Hirsch again stated: "[W]hen I went down to talk to the neighbors I came back up and [Laurie] was on the floor where I left her." Then minutes later, Hirsch changed his story. Instead of saying that he had left Laurie on the floor when he went down to the neighbors, Hirsch said that he had put Laurie in her crib *before* he went down to the neighbors:

Yes [Laurie] was [in bed], but I held her and that stuff and we put her on the floor and we were playing and Melissa was there and Angela was there and then when then *when um I went down to see the neighbors,* you know, *I put Laurie back in her crib and Missy and Angel was in their bed and I went down* to you know, to see and then I came back upstairs and a and I was watching TV and it sounded like she couldn't breath so I went in there and I picked her up and patted her on the back I thought maybe she swallowed something. I put my

766

> finger down in her you know throat to see if she had anything and I couldn't find anything so then I took and I told Missy and Angel I'd be back and I took Laurie and I ran downstairs. (Emphasis added.)

Hirsch said that the neighbor drove him and Laurie to the hospital, and that he had to leave the other two children home alone. He also said that he never knew what had caused Laurie's death.

¶ 18. The second and third tapes, made on December 12 and 17, 1996, documented conversations between Hirsch and Melissa (who had been two-and-one-half years old when Laurie died in 1970). Like Campbell, Melissa also questioned Hirsch about Laurie's death. This time, Hirsch told Melissa a third version of the events of December 2, 1970. He said that he was home alone with the children but got called into work and had the downstairs neighbors baby-sit the children. He said that later he was called home from work when Laurie got "sick." Pertinent portions of their conversations demonstrate the discrepancies in his stories:

> [Melissa] . . . I picked up a certificate, a death certificate, and I was reading it and I was reading the extents of her injuries and
>
> [Hirsch] What injuries
>
> [Melissa] Laurie
>
> [Hirsch] I didn't know she had any injuries
>
> [Melissa] Well, um, she, she had some pretty extensive injuries, anyways
>
> [Hirsch] From what, I don't know, your mother never told me. I know she died in the hospital but from what I don't know

[Melissa] You have no idea

[Hirsch] No, I was never told, we, I never got a paper on it

[Melissa] Well, I have a question for you cause mom always said that a, it, a, I was, you had always said that I did it. I accidentally killed her

[Hirsch] What you did, I never said anybody killed her. Nobody ever said that

[Melissa] Cause all these years I always thought it was my fault

. . . .

[Hirsch] Nobody killed her

[Melissa] My understanding was that um this happened at home and you were the only one there

[Hirsch] *No, no, no, no, no, no when Laurie was sick, your mother was out Christmas shopping and I had to go in to we were I was working at the hospital. I got called in cause I worked in surgery you know like you know for scrubbing surgery floors and I was called in there and they babysat Laurie*

[Melissa] Who babysat Laurie

[Hirsch] The people that lives downstairs from us, I don't even remember their name. . . .

. . . .

[Hirsch] *[The neighbors] called me at work,* I don't know where your mother went Christmas shopping, nobody knew, so there was no way for them to get a hold of her *so they called me at work, I went home and then they took me, I looked at Laurie and she wasn't breathing, she was breathing but not right and I took and they*

768

*took me into the hospital* with her cause we only had one vehicle at the time and your mother had the car (Emphasis added.)

At some point, Melissa specifically asked, "So she died because she was sick is what you're saying[?]" Hirsch replied:

I guess so, that's that's what I guess so yes cause nobody told me any difference and if she would a if she would a if somebody would a hurt her or she would have been beat up or something like that the the doctor would have said something but nobody ever said nothing

[Melissa] Cause the death certificate says nothing about her being sick

[Hirsch] Well what does the death certificate say

[Melissa] She just had major head injuries

[Hirsch] Well see I never knew that, nobody ever said that to me

[Melissa] and I was told that

[Hirsch] and your mother, and your mother never said anything to me and your mother never told me that your mother never told me anything about that a, a you were responsible. Nobody blamed, nobody ever blamed anything, nobody was blamed for anything, nobody, none of you kids, your mother or I. If they said she died of injuries then if she died of head injuries then that's the first time I know anything about it

[Melissa] Well, that's what I was told was that a you were you were left home by ourselves or whatever and um

[Hirsch] no

[Melissa] and um you said that I dropped a book on her head and

769

[Hirsch] no

[Melissa] that it was my fault

[Hirsch] no, nobody said anything about that. Your mother, I never said that to your mother cause there was no responsibility, nobodys responsible. She died in the hospital. That's what I, that's what I was told and that's what your mother told me and that's what, that's where she died in the hospital but she wasn't there because of any injuries that I know of. . . .

¶ 19. Finally, Melissa asked Hirsch: "So when you took Laurie to the hospital you just left, you left her there and went back home?" In his previously taped conversation with Campbell, the jury heard Hirsch tell Campbell that he *had* left Laurie at the hospital and was not at the hospital when Campbell arrived because he had to leave and go back home to be with the other two children. Here, the jury listened as Hirsch answered Melissa's question by telling her that he *did not* leave the hospital: "[n]o, no, no, no, your mother, your mother came in to see her and that stuff and we were there quite a while with her and I believe she went, I don't remember too well but that's a long time ago but I believe that we went home and that she died in the hospital the next day or something like that."

¶ 20. In addition to hearing these taped conversations, which reveal that Hirsch changed his story in numerous ways, the jury heard testimony from Detective Sorenson, Allen Mohs (Hirsch's downstairs neighbor who drove Hirsch and Laurie to the hospital in 1970), Richard Suscha (the Sheboygan county coroner who examined Laurie's body in 1970), Melissa (Hirsch's daughter), and Dr. Stephen Lazoritz and Dr. Robert Huntington (two medical specialists).

¶ 21. Sorenson told the jury that he reviewed Laurie's death certificate, the coroner's docket and some medical reports in order to confirm the need for an investigation. Then, based on what he learned, he began an investigation. In addition to arranging for and making the tapes, he asked two medical specialists to consult on the case: Dr. Stephen Lazoritz of the Child Protection Center in Milwaukee, Wisconsin, and Dr. Robert Huntington, a forensic pathologist.

¶ 22. Mohs, Hirsch's neighbor in 1970, testified that on December 2, 1970, he was at home with his wife. He said the first time he saw Hirsch on that day was when Hirsch came down to the back door and asked Mohs if he could take him and his baby to the hospital. Mohs said that Hirsch told him that his two-year-old daughter had hit the baby over the head with a book and the baby's head was swelling up. He said that while he and Hirsch went to the hospital with the baby, Mohs's wife took care of Hirsch's other two children.

¶ 23. Suscha, the Sheboygan county coroner at the time of Laurie's death, testified that on December 2, 1970, someone from St. Nicholas Hospital notified him that there was a sudden death at the hospital. He then proceeded to the hospital where he examined Laurie's body and talked to the emergency room physician, Dr. Madani. His examination showed a young child with a swollen right frontal/parietal area of the brain.

¶ 24. Suscha said that he met with Hirsch alone in the hospital lobby after he examined the body. He said that Hirsch was very distraught and told him that his two-year-old daughter had struck the one-month-old baby with a book while they were on the sofa. He said Hirsch told him that the baby had developed difficulty breathing and that he then took her to the hospital. Suscha said that he had not personally told

Hirsch that Laurie was dead. However, he believed that Hirsch knew by the time Suscha had spoken to him. Suscha ordered an autopsy, which was performed by Dr. Jaeck, the pathologist at St. Nicholas Hospital.

¶ 25. Suscha's coroner's docket, recorded on December 2, 1970, relayed the information he had been told by Hirsch at the time: that a two-year-old child had struck the infant with a book. This was consistent with Suscha's trial testimony that Hirsch had told him that the baby had been hit with a book. Also attached to Suscha's coroner's docket was a portion of Dr. Jaeck's autopsy report.[6] In Dr. Jaeck's report, he indicated that having completed his autopsy, he believed that Laurie's death was caused by child negligence involving the parents, whether active or passive. The morning after Laurie died, Suscha said he notified the police as part of his normal procedure with any unexpected death.

¶ 26. Melissa Zack, Hirsch's daughter, told the jury that when she was eight years old she remembered a visit with Hirsch in Tomahawk, Wisconsin, when she had asked him how Laurie died. Hirsch told her that Laurie had an accident and a book fell on her head. Melissa explained that she had been prompted to ask Hirsch about Laurie's death back then because she was "[c]urious I guess. Probably because I had heard [my mom and aunts talk] that [Laurie] had a book dropped on her head."

¶ 27. Finally, the jury heard testimony from the two medical specialists who consulted on the case. Doctor Stephen Lazoritz, the medical director of the Child Protection Center at Children's Hospital of Wisconsin and a pediatric specialist in the area of child

---

[6] Apparently, the entire autopsy report was never given to the coroner and it was never located in the investigation.

abuse and neglect, said he reviewed the coroner's docket, Laurie's death certificate, and some medical reports from the emergency room doctor. Doctor Lazoritz testified that the various medical documents described an infant who had "an impact injury of a very severe nature . . . because trivial trauma to the head does not cause hemorrhage on the layers surrounding the brain. . . . So this baby received a significant blow to the head, on the right side of the head. . . ." He testified "with this degree of finding, it's my opinion that the baby would probably immediately have a change in consciousness that was quite dramatic."

¶ 28. Doctor Lazoritz testified that it was his belief that "[a] two-year-old hitting an infant with a book would not result in these injuries." He noted that "a child falling off a sofa would not have these injuries." He testified that he had seen injuries like this in certain cases: high velocity car accidents, children who have fallen out of second or third story windows, and children who have been abused. He testified that "[w]ith the magnitude of force on this child, the baby would have been more than just lethargic. It's my opinion this baby would have been unconscious."

¶ 29. Doctor Robert Huntington, a forensic pathologist, testified that on June 3, 1997, he examined the exhumed body of Laurie Hirsch. He said that he noted that there had been a prior autopsy on the body, but that he was still able to perform a partial autopsy. He said he could see that the right side of the skull was very different from the left side. On the right side, he could see old blood in the tissue outside and the bones under that had been separated and he could see blood on the edges of the separations in a way that was not true of the left side. Further, he said that the dura (the tough lining inside the skull over the brain) was sepa-

rated from the bones on the right in a way that it was not on the left. He testified that these separations and the blood would not have been the result of the prior autopsy because when performing an autopsy "what happens on on[e] side happens to the other, and the fact of all this bleeding, also was not what you expect an autopsy to do. After all, an autopsy is done when there isn't any blood pressure. So you don't get bleeding."

¶ 30. Doctor Huntington testified that the injury he observed could not have been caused by a fall off an ordinary sofa to an ordinary floor; he said, "Well, if the sofa was on the second floor and she went clean off a second floor on to the first floor. Maybe. But fall off an ordinary sofa to an ordinary floor, forget it." He testified that he could not believe that an "ordinary [two year old] on the same level floor, [could] get that amount of oomph behind a book." He testified that there "had to be external force applied to . . . get this disaster started." He emphasized, "we've got real injury there." Finally, he testified that illness could not be the cause of the findings and that "[t]his is injury, period."

¶ 31. On March 22, 2000, the jury found Hirsch guilty of second-degree murder. Thereafter, the circuit court sentenced Hirsch to an indeterminate prison term not to exceed nine years. Hirsch appeals, claiming that the evidence produced at trial was not sufficient for the jury to find him guilty of second-degree murder under WIS. STAT. § 940.02.

¶ 32. Again, we emphasize our standard of review: when a criminal defendant argues on appeal that the evidence was insufficient to convict him or her, we do not retry the case on the facts to determine if each member of this court is convinced of the defendant's guilt beyond a reasonable doubt. *State v. Wilson*, 149 Wis. 2d 878, 893, 440 N.W.2d 534 (1989). Rather, we

must affirm a conviction if we find that the jury, acting reasonably, could have found guilt beyond a reasonable doubt. *Id.* at 893–94.

¶ 33. Further, the function of weighing the credibility of witnesses is exclusively within the jury's province, and the jury verdict will be overturned only if, viewing the evidence most favorably to the State and the conviction, it is inherently or patently incredible or so lacking in probative value that no jury could have found guilt beyond a reasonable doubt. *Id.* at 894.

¶ 34. Hirsch argues, citing *Seidler v. State*, 64 Wis. 2d 456, 219 N.W.2d 320 (1974), that there is insufficient evidence to prove the conduct and the mental state necessary to establish second-degree murder. We disagree with Hirsch's conclusion and believe that *Seidler* is readily distinguishable on its facts.

¶ 35. In *Seidler*, a twenty-two-year-old male babysitter was originally convicted of second-degree murder for causing the death of a two-year-old child. *Id.* at 457. The evidence produced at trial was consistent with the defendant's version of his conduct. The defendant testified that he had angrily grabbed the child by the arm and threw her into a bedroom in the direction of a bed where she hit her stomach against a portion of the bed. *Id.* at 458.

¶ 36. The supreme court held that the defendant's conduct, though done in a reckless and callous manner, was not consciously such conduct that is imminently dangerous to life so as to serve as the basis for a conviction for second-degree murder. *Id.* at 464. In addition, the court found that although the defendant's conduct created a situation of unreasonable risk of harm or death to the two-year-old child, the defendant's

775

conduct did not evince a depraved mind regardless of human life. *Id.* at 464–65. In other words, the court found that the evidence was insufficient because there was a theory of criminal conduct short of second-degree murder that the evidence did not disprove: that the fatal injury occurred when the defendant threw the victim into her bed, and the defendant did not "consciously thr[o]w [the victim] at the hard and unyielding portions of the bed." *Id.* at 463. Further, the defendant's testimony supported this theory. Therefore, the court reversed the defendant's conviction of second-degree murder and ordered a new trial on the charge of homicide by reckless conduct. *Id.* at 466.

¶ 37. Unlike in *Seidler*, in the present case, Hirsch offers no evidence of misadventure that could account for the trauma sustained by Laurie. The jury heard testimony from other witnesses and heard tapes of Hirsch himself, which demonstrated that he gave conflicting explanations for the cause of Laurie's injury: The State produced evidence that in 1970, on the day of the incident, Hirsch told his neighbor *and* the coroner that his two-year-old daughter Melissa had struck Laurie on the head with a book. Melissa testified that approximately six years after Laurie's death, Hirsch told her that Laurie had died because she had an accident and a book fell on her head. Twenty-six years later, in a taped phone conversation with Campbell, when asked to explain what happened, Hirsch offered no explanation for the cause of Laurie's injury and when Campbell said she remembered he told her that Melissa had hit Laurie on the head with a book, he said, "That could have happened. I don't know for sure. I have no idea for sure." Twenty-six years later, and less than one month after telling Campbell that Melissa

hitting Laurie on the head with a book "could have happened," the jury heard Hirsch tell Melissa that

> no, nobody said anything about that. Your mother, I never said that to your mother cause there was no responsibility, nobodys responsible. She died in the hospital. That's what I, that's what I was told and that's what your mother told me and that's what, that's where she died in the hospital *but she wasn't there because of any injuries that I know of.* . . . (Emphasis added.)

¶ 38. In conflict with Hirsch's taped statement that Laurie did not have any injuries that he knew of, the State presented persuasive medical evidence that Laurie died as a result of severe injury. First, the initial autopsy report by Dr. Jaeck, the pathologist who examined the body immediately after Laurie's death, stated that he believed the "injury" was less than twelve hours old and resulted from either a blow or a fall. Doctor Jaeck concluded that Laurie suffered a head trauma "severe enough to have caused death." Doctor Jaeck documented a large skull fracture, along with bleeding and herniation of the brain. He suggested that there was "child negligence involving the parents, whether active or passive." Consistently, Dr. Lazoritz, the pediatric child abuse specialist, testified that he believed this infant had "an impact injury of a very severe nature . . . because trivial trauma to the head does not cause hemorrhage on the layers surrounding the brain. . . . So this baby received a significant blow to the head, on the right side of the head. . . ." Both Dr. Lazoritz and Dr. Huntington agreed that the trauma required to cause an injury of the nature sustained by Laurie would have had to come from a magnitude of force such as a fall from a second or third story. Doctor Lazoritz added that this is the type of injury he sees in a high velocity car accident or in a case of child abuse.

¶ 39. Additionally, the State presented evidence to support the theory that the trauma causing Laurie's death had to have been caused during the time when Hirsch was home alone with Laurie. In the taped conversation between Campbell and Hirsch, Hirsch agreed with Campbell that Laurie was okay when Campbell left to go Christmas shopping. Then, later that evening, Hirsch's neighbor, Allen Mohs, said that Hirsch came to his apartment alone to ask for a ride to the hospital. He said that Hirsch told him that his two year old had hit Laurie on the head with a book. Also, in the initial autopsy report, Dr. Jaeck said that in his opinion, the injury was less than twelve hours old.

¶ 40. We must determine whether such evidence, believed and rationally considered by the jury, is sufficient to circumstantially establish the elements of second-degree murder. The test, as we stated earlier, is whether it is strong enough to exclude every reasonable hypothesis of innocence. *Johnson*, 135 Wis. 2d at 456. This is a question of probability, not possibility. *Id.* at 457. After considering the evidence as a whole, and especially the medical testimony and the evidence that Hirsch significantly changed his story both over time and depending on his audience, we conclude that the jury could eliminate accident or misadventure as a reasonable hypothesis of innocence. *See id.* at 465. The medical testimony concerning the level of force needed to cause the injury, coupled with the surrounding circumstances, arguably places such a theory beyond the realm of possibility. *See id.*

¶ 41. As to other circumstances of death short of second-degree murder, we are satisfied that the jury could have drawn the appropriate inferences from the evidence adduced at trial concerning the nature of the injury to conclude that these do not fall within the

realm of probability as required by the law of circumstantial evidence. *Id.* After weighing all the evidence, we conclude that the jury could properly find that there was no reasonable conclusion but that Hirsch was the instrument of Laurie's death under circumstances constituting second-degree murder. The evidence adduced at trial was sufficient for the jury to find Hirsch guilty of second-degree murder under WIS. STAT. § 940.02; therefore, we affirm.

*By the Court.*—Judgment affirmed.