COURT OF APPEALS
DECISION
DATED AND FILED

January 5, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2019AP1778-CR**

Cir. Ct. No.  **2016CF708**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

AARON A. KENNEDY,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County:  T. CHRISTOPHER DEE, Judge.  *Affirmed*.

Before Brash, P.J., Dugan and Donald, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1      PER CURIAM.   Aaron A. Kennedy appeals a judgment of conviction entered after a jury found him guilty of five felonies.  He also appeals an order denying his motion for postconviction relief.  He claims that his trial counsel was ineffective for failing to cross-examine two witnesses about their allegedly inconsistent pretrial statements, and he claims that the evidence was insufficient to sustain one of his convictions.  We reject his claims and affirm.

## Background

¶2      The State filed a criminal complaint alleging that on the night of November 15, 2015, police responded to the scene of a shooting at a home in the 500 block of East Clark Street, Milwaukee.  The State alleged that an armed gunman with intent to steal had forced his way into the home, threatened to kill the residents, Sandy and Mike, and shot Mike in the hand before Sandy was able to pull the gunman out of the home.[1]  The State further alleged that after Sandy viewed a photo array and identified Kennedy as the gunman, police arrested him on February 13, 2016, in his home in the 1300 block of West Burleigh Street, Milwaukee, and that a search of his home uncovered a revolver in the basement.  The State charged Kennedy with multiple offenses, and the case ultimately proceeded to trial on five charges:  attempted first-degree intentional homicide and first-degree recklessly endangering safety, both by use of a dangerous weapon; armed burglary; and two counts of possessing a firearm as a felon, one arising on November 15, 2015, and one arising on February 13, 2016.

---

[1] To protect the victims' privacy, we refer to them by the pseudonyms Sandy and Mike. *See* WIS. CONST. art. I, § 9(m), WIS. STAT. RULE 809.86(5) (2017-18).  All subsequent references to the Wisconsin statutes are to the 2015-16 version unless otherwise noted.

¶3 At trial, Mike testified that on November 15, 2015, he heard a knock at the door of his home. He said that he has only one leg, and he used crutches to reach the door to answer the knock. When he opened the door, he saw a man holding a black gun with a brown handle. Mike tried to push the door closed, but the gunman fired a shot into the home. Mike seized the gun barrel and in the ensuing struggle, the gunman entered the home.

¶4 While the two men continued to fight for control of the gun, Mike shouted for Sandy. She seized a third crutch and struck the intruder in the head. The intruder shouted that he was "going to kill y'all," and Mike and the intruder fell to the ground. When the men got up, the intruder had the gun, and Mike raised his hands. As Sandy pulled the intruder out the door, he fired a shot that hit Mike in the hand. The intruder then fled.

¶5 Sandy testified that on November 15, 2015, she and Mike were in separate rooms in their home when she heard Mike shout her name. She acknowledged that she did not hear a gunshot at that time. She said that when she entered the kitchen, she saw Mike confronting a gunman, and she identified the gunman from the witness stand as Kennedy. Sandy said she hit Kennedy with a crutch, and he threatened that she "would die tonight." Sandy described how she, Mike, and Kennedy struggled for the gun, which she said was long with a brown handle. She told the jury that she was eventually able to open the door to her home and that Kennedy shot Mike while she was pulling Kennedy out the door.

¶6 Officer Curtis Pelczynski testified that on November 15, 2015, he responded to the scene of a reported shooting and spoke to Mike and Sandy in their home shortly before paramedics took Mike to the hospital. Pelczynski observed that Mike was an amputee with only one leg and that he had sustained a gunshot

wound to his left hand. Pelczynski also observed three bloody crutches and blood on the floor of the home. Pelczynski testified that he subsequently received notice of the results of the DNA analysis conducted on evidence collected at the crime scene. Those results revealed that Kennedy was the source of some of the blood found in the home. In February 2016, Pelczynski showed Sandy a photo array from which she identified Kennedy as the gunman.

¶7     Pelczynski then described how he, along with a team of other officers, arrested Kennedy on February 13, 2016. Pelczynski said that when the officers arrived at Kennedy's home, they spoke to Kennedy through a window and identified themselves. Approximately five minutes later, he allowed them into the home, where the officers arrested him. During a search of the home incident to the arrest, the police found a large empty holster in one of the bedrooms that also contained utility bills and other mail addressed to Kennedy and a credit card in his name. In the basement, police found a gun with a long black barrel and a brown handle, and Pelczynski testified that the gun would fit into the holster found in the bedroom.

¶8     Kennedy testified on his own behalf, stipulated that he was a felon, and admitted that he had fourteen prior convictions. He said that on November 15, 2015, he went to Mike's home to buy marijuana, that he did not bring a gun with him, and that Mike allowed Kennedy into the home without a fight. Mike then left Kennedy in the kitchen and went to another room. Kennedy testified that Mike used crutches when he left the kitchen, but Kennedy then testified that Mike "wasn't on crutches" and that he had "two feet, two legs." Kennedy next told the jury that when Mike returned to the kitchen, he had a gun that he pointed at Kennedy. The two men fought for the gun, and it went off. According to Kennedy, the bullet "went through [his] hand, around, and kind of grazed [his] thumb." Kennedy said that following the first gunshot, he and Mike continued to fight for control of the gun

and once again it went off in the struggle. Kennedy said that he then got up "in shock" and left the home. He acknowledged that he did not go to the hospital to seek treatment for a gunshot wound.

¶9    The jury found Kennedy guilty as charged, and he moved for postconviction relief on the ground that his trial counsel was ineffective for failing to impeach Sandy and Mike during cross-examination with statements they made to Pelczynski on November 15, 2015. With the motion, Kennedy submitted Pelczynski's police report documenting Sandy's and Mike's statements. In support of the postconviction claim, Kennedy relied on Sandy's statement that she "heard one gunshot and then was able to pull [Kennedy] out of the house." Kennedy further relied on Mike's statement that "[Mike] and [Kennedy] fell to the ground and continued to fight over the firearm. [Mike] stated that [Kennedy] then fired one shot striking [Mike] in the left hand. [Mike] stated that [Sandy] was then able to pull [Kennedy] off of him out of the house." Kennedy argued that these statements "directly contradict[ed]" Sandy's and Mike's trial testimony and supported Kennedy's claim that the gun fired accidently while he and Mike struggled to control it. According to Kennedy, trial counsel should have introduced these allegedly inconsistent statements because they would have undermined the State's theory that he intended to kill Sandy and Mike, and, more generally, would have undermined their credibility and sowed reasonable doubt about Kennedy's guilt.

¶10    The circuit court rejected Kennedy's claim without a hearing, concluding that trial counsel's cross-examination was not ineffective because the statements that Sandy and Mike gave to Pelczynski were not inconsistent with the testimony they gave at trial. Kennedy appeals, challenging the circuit court's postconviction order and additionally alleging that the evidence was insufficient to support his conviction for possessing a firearm as a felon on February 13, 2016.

5

**Discussion**

¶11     We begin with Kennedy's claim that his trial counsel was ineffective. A defendant who alleges ineffective assistance of counsel must prove both that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether counsel's performance was deficient and whether the deficiency was prejudicial are questions of law that we review *de novo*. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶12     To demonstrate deficient performance, the defendant must show that counsel's actions or omissions "fell below an objective standard of reasonableness." *See Strickland*, 466 U.S. at 688. To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If a defendant fails to satisfy one component of the analysis, a reviewing court need not address the other. *Id.* at 697.

¶13     A defendant cannot prevail on a claim of ineffective assistance of counsel absent an evidentiary hearing, *see State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979), but the circuit court is not required to grant a hearing on such a claim unless the defendant's motion contains allegations of material fact that, if true, would entitle the defendant to relief, *see State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. This determination is another question of law for our independent review. *See id.* If, however, the defendant does not allege sufficient material facts that, if true, entitle him or her to relief, if the allegations are merely conclusory, or if the record conclusively shows that the defendant is not entitled to relief, the circuit court has discretion to deny the claim

6

without a hearing. *See id.* We review a circuit court's discretionary decisions with deference. *See id.*

¶14 Kennedy argues that his trial counsel performed deficiently because trial counsel did not impeach Sandy and Mike with pretrial statements that were allegedly inconsistent with the testimony each gave at trial. According to Kennedy, the victims' pretrial statements to Pelczynski showed that Kennedy shot Mike while the men tussled for the gun, "not in a careful, deliberately-aimed manner," and thus the prior statements tended to negate the element of intent necessary to prove attempted first-degree intentional homicide.[2]

¶15 When we assess trial counsel's performance, the test we apply "is objective, not subjective." *See State v. Carlson*, 2014 WI App 124, ¶30, 359 Wis. 2d 123, 857 N.W.2d 446 (citation omitted). Accordingly, we "determine whether defense counsel's performance was objectively reasonable according to prevailing professional norms." *State v. Kimbrough*, 2001 WI App 138, ¶31, 246 Wis. 2d 648, 630 N.W.2d 752.

¶16 Failure to impeach a witness with prior inconsistent statements can be objectively unreasonable. *See State v. Honig*, 2016 WI App 10, ¶44, 366 Wis. 2d 681, 874 N.W.2d 589. The allegedly impeaching prior statements must, however, be actually inconsistent with the witness's trial testimony. *See Johnson*, 153 Wis. 2d at 130 (rejecting a claim that trial counsel was ineffective for failing to cross-examine a victim about a prior statement because the statement was not

---

[2] The elements of attempted first-degree intentional homicide are: (1) the defendant intended to kill the victim; and (2) the defendant did acts toward the commission of the crime of first-degree intentional homicide that demonstrated unequivocally, under all of the circumstances, that the defendant intended to kill and would have killed the victim except for the intervention of another person or some other extraneous factor. *See* WIS JI-CRIMINAL 1070; WIS. STAT. §§ 940.01(1)(a), 939.32(1).

7

"inconsistent with any degree of certainty"). Here, the circuit court found that Sandy's and Mike's statements as described in the police reports were less detailed then the testimony that Sandy and Mike offered at trial but that the statements and the testimony did not conflict. We agree with the circuit court.

¶17 Sandy told police in her pretrial statement that after Mike and Kennedy fell to the ground, she "opened the front door and grabbed [Kennedy] by his sweatshirt and tried to pull him off of [Mike. Sandy] stated she then heard [one] gunshot and then was able to pull [Kennedy] out of the house."

¶18 At trial, Sandy testified during her direct examination that when Kennedy fired the gun, it was pointed at Mike, and she was "pulling [Kennedy] out of the house." On cross-examination, Sandy similarly testified that at the time of the shooting, Kennedy "was in [her] doorway ... still over on top of [Mike]" and that after she heard a gunshot, she was able to pull Kennedy out of the house. On redirect examination, she said that when she heard the gunshot, she was standing on the step outside of her home, Kennedy was inside, and she was pulling him.

¶19 Although Kennedy asserts that Sandy's pretrial statement and trial testimony conflict, we are satisfied that no meaningful discrepancies exist between Sandy's testimony and the short prior statement on which Kennedy relies. In both the testimony and the pretrial statement, Sandy said she heard a gunshot while she was pulling on Kennedy in an effort to get him out of her home. Her trial testimony was more detailed than her pretrial statement, but the information she provided was

consistent. Accordingly, trial counsel did not, as a matter of law, perform deficiently by forgoing efforts to impeach her with that prior statement.[3]

¶20 We reach a similar conclusion in regard to Kennedy's claim that trial counsel failed to cross-examine Mike about his allegedly inconsistent pretrial statement. Kennedy describes the police report as reflecting that Mike told police that he and Kennedy "were on the ground tussling for the gun when it went off," thus refuting Mike's suggestion that Kennedy deliberately fired a shot and instead supporting Kennedy's claim that "the weapon was discharged accidently while the parties were wrestling on the ground to control [the gun]." Kennedy, however, does not accurately describe Mike's pretrial statement.

¶21 According to the police report, Mike told Pelczynski:

> [Kennedy] stated[:] "y'all going to die now since you want to fight." [Mike] stated he and [Kennedy] then fell to the ground and continued to fight over the firearm. [Mike] stated that [Kennedy] then fired [one] shot, striking [Mike] in the left hand. [Mike] stated that [Sandy] was then able to pull [Kennedy] off of [Mike] and out of the house.

The report thus does not say that Mike and Kennedy were on the ground when Mike was shot. Rather, the report is silent as to the position of the two men at the time of the shot. Moreover, the report does not say that Mike described an accidental shooting or that he told the officer that the gun "went off." Rather, the report reflects Mike's contention that Kennedy "fired [one] shot."

---

[3] For the sake of completeness, we observe that trial counsel did impeach Sandy with an actual inconsistency between her testimony and the police report. Specifically, counsel showed that Sandy made a pretrial statement that before she encountered Kennedy in her home, she heard a loud bang. At trial, she testified that she did not hear any such noise and that the police report describing her statement was wrong. During closing argument, trial counsel emphasized this inconsistency to discredit Sandy.

¶22　At trial, Mike testified similarly. On direct examination, he said that Kennedy threatened to "kill y'all" while the men struggled for control of the gun. They fell to the ground, and when they got up, Kennedy had the gun. A "gunshot went off ... [and t]hat's when [Kennedy] got pulled out the door unexpectedly by [Sandy]." On cross-examination, Mike further explained that before he was shot, "his hand was up in the air ... [b]ecause [he and Kennedy] fell on the ground. [Mike] got up ... and [he] moved to the side. That's when [Sandy] pulled [Kennedy] out and he was startled off and shot the gun."

¶23　In sum, both immediately after the incident and at trial, Mike said that Kennedy made a death threat, and Mike then described being shot by Kennedy while Sandy was pulling Kennedy out of the house. The descriptions vary in detail but they are not "inconsistent with any degree of certainty." *See **Johnson***, 153 Wis. 2d at 130. Therefore, as a matter of law, Kennedy's trial counsel did not perform deficiently when cross-examining Mike about his description of the events in his home on November 15, 2015.

¶24　Because Kennedy fails to satisfy the deficiency prong of the ***Strickland*** analysis, we need not consider the prejudice prong. *See **id.***, 466 U.S. at 697. The circuit court properly denied Kennedy's claim of ineffective assistance of counsel without a hearing.

¶25　We turn to Kennedy's claim that the State presented insufficient evidence at trial to prove that Kennedy possessed a firearm on February 13, 2016. Whether evidence was sufficient to support a conviction is a question of law that we review *de novo*. *See **State v. Smith***, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. Our review is "highly deferential." *See **State v. Rowan***, 2012 WI 60, ¶26, 341 Wis. 2d 281, 814 N.W.2d 854. We may not reverse a criminal conviction unless

the evidence, viewed in the light most favorable to the State, "is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *See* ***State v. Poellinger***, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). If more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict, and we may not overturn the verdict if any possibility exists that the jury could have drawn the appropriate inferences from the evidence to find guilt. *See* ***id.*** at 506-07. Our standard of review is the same whether the evidence is direct or circumstantial, *see id.* at 507, and the conviction may be based in whole or in part upon circumstantial evidence, *see* ***State v. Hirsch***, 2002 WI App 8, ¶5, 249 Wis. 2d 757, 640 N.W.2d 140.

¶26 In this case, the jury could find Kennedy guilty of possessing a firearm while a felon if the State proved beyond a reasonable doubt that: (1) he possessed a firearm on February 13, 2016; and (2) he had been convicted of a felony before that date. *See* WIS JI—CRIMINAL 1343; WIS. STAT. § 941.29(1m)(a). At trial, Kennedy stipulated to his status as a felon, and on appeal he argues only that the evidence was insufficient to prove that he possessed a firearm.

¶27 Kennedy first contends that the evidence was insufficient to prove that he possessed the firearm found in the basement of his home on February 13, 2016, because the State did not offer any "physical evidence" linking him to the weapon. We disagree. The State showed that among Kennedy's belongings was a holster that would hold the gun.

¶28 Kennedy also argues that the evidence was insufficient because the State did not offer any evidence that he had access to or control over the firearm. The State, however, is not required to prove physical control over contraband to

prove possession of that contraband. *See State v. Allbaugh*, 148 Wis. 2d 807, 813, 436 N.W.2d 898 (Ct. App. 1989). Rather, a person may possess contraband when it is found "in a place immediately accessible to the [person] and subject to his or her exclusive or joint dominion and control, provided that the [person] has knowledge of the presence of the [contraband]." *Id.* at 814 (citation and one set of brackets omitted).

¶29  Here, as the State explains, the jury could infer that Kennedy had knowledge of the gun in his basement because the basement was a common area of the home and accessible to its residents. *See id.* The jury could additionally infer Kennedy's knowledge of the gun because he had a holster big enough to hold the weapon and because the weapon matched the description of a long-barreled gun with a brown handle that Sandy and Mike saw Kennedy holding on November 15, 2015. Further, the jury could infer that Kennedy exercised dominion and control over the gun found in his basement because, as a resident of the home, he had control over its common areas. *See id.* Finally, the jury could take into account that Kennedy refused to open the door for at least five minutes after police arrived at his home, giving him time to move the gun to the basement. Although this evidence was largely circumstantial, it is no less sufficient for that reason. Indeed, we have long recognized that "circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence." *See Poellinger*, 153 Wis. 2d at 501.

¶30  We observe that Kennedy filed a reply brief that does not mention his challenge to the sufficiency of the evidence, effectively conceding the issue. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578. We accept his concession as appropriate in light of the evidence presented, which amply satisfied the State's burden to prove that Kennedy possessed a firearm on February 13, 2016. For all the foregoing reasons, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).